SAEED MORAD vs. KARAM H. HADDAD & another.

Bristol.    October 27, 1952. — February 2, 1953.

Present: QUA, C.J., RONAN, WILKINS, SPALDING, & WILLIAMS, JJ.

*Broker*, Commission.    *Sale*, Of corporate property, Of stock.

Findings that the sole owner of a corporation promised a broker a specified commission if he procured a purchaser of the property of the corporation for a certain price and that the broker procured a customer who, after negotiating with the owner and without the broker's employment having been terminated, purchased all the stock of the corporation at a price acceptable to the owner, although smaller than the price originally stated to the broker, supported a conclusion that the broker was entitled to be paid by the owner a commission based on the price paid by the customer; the sale of all the stock was in substance a sale of the corporate property.

BILL IN EQUITY, filed in the Superior Court on June 8, 1951.

Following a report of a master an interlocutory decree confirming it was entered by order of *Cahill*, J., and a final decree by order of *Paquet*, J.

*Solomon Rosenberg*, for the defendant.

*Gerald P. Walsh*, for the plaintiff.

WILLIAMS, J.    This is a bill in equity to recover from the defendant Haddad a broker's commission alleged to have been earned by effecting the sale of the real and personal property of the defendant Wareham Auto Co., Inc., in Wareham, and to reach and apply in payment of the commission a mortgage note of the said corporation to Haddad. The case was referred to a master whose report was confirmed, and the exceptions of the defendants to the report were overruled by interlocutory decree. A final decree was entered in favor of the plaintiff. The defendants appealed from both decrees, but subsequently Wareham Auto Co., Inc., waived its appeal from the final decree.

The findings of the master are summarized as follows. The Wareham Auto Co., Inc., is a Massachusetts corporation and in January, 1951, owned a parcel of land in Wareham on which were located a combination garage and automobile showroom and eight roadside cabins. The corporation conducted an automobile sales business and operated the cabins. Of the fifty shares of its corporate stock forty-seven stood in the name of Haddad and three in the names of two employees. Haddad was the sole owner of the corporation and controlled the three shares standing in the names of the employees. He was both president and treasurer. The plaintiff Morad with two other men met Haddad at the corporation's place of business on the evening of January 11, 1951, in connection with the delivery of some liquor which Haddad had ordered. Haddad paid for the liquor with a check of the corporation. In the conversation which followed Haddad said that he desired to sell the business as he wanted to leave this part of the country. One of the men said Morad was a real estate dealer and would handle it. "Morad asked Haddad the price he was asking, and he told Morad to ask $60,000, that he would take $50,000 and Morad would have $10,000 as a commission. He further told him [Morad] that this would include all the land and buildings, the cabins, linens used in the cabins, the automobile accessories, and the sales agency for the automobiles which he said [he] would be able to transfer to the buyer, but not the automobiles themselves — these were to be paid for 'dollar for dollar' and were to be outside the $60,000 price. Haddad told them that he owned the corporation." He also said that he would take back a $25,000 mortgage from the purchaser at 5% interest "but that he wanted the balance of $25,000 not to be shown in full because he was incorporated only for $5,000 . . . and therefore, there had to be a deal 'under the table' so that he would have not to pay 'a big' tax on the deal. He told Morad that he was to bring the buyer to him and that he, Haddad, would take care of the details." Morad told Haddad, "I have nothing to do with this, I

will bring the customer to you and you fix it up yourself."
Haddad then took Morad and one of the other men "on
a tour of inspection of the premises."

On the next day Morad brought one Joseph Baron, to
whom he had said that the asking price was $60,000, to
the premises and told Haddad that Baron was interested
in buying the property. Morad overheard Haddad tell
Baron that his asking price was $55,000 and asked Haddad
what he meant by cutting the price. Haddad replied "that
he need not worry that he would get his commission just
the same." For about a month thereafter Baron conferred
with Haddad almost daily "seeking to buy the property."
Morad saw Haddad a few times "to find out how the deal
was progressing." On March 12, 1951, Haddad "trans-
ferred the 50 shares to Baron and his sons," Morad not
being present. Two mortgages, each in the. amount of
$10,000, held by a relative of Haddad, which Haddad said
were on the property to protect him, were · discharged
and a new mortgage was given to Haddad by the corpora-
tion in the amount of $25,000 with interest at 5%. As a
part of the transaction Haddad made a written agreement
with the corporation signed in behalf of the latter by Baron
as president and by one of his sons as treasurer in which
Haddad covenanted that the real and personal property
of the corporation was "free from all encumbrances, except
as enumerated," and that "he agreed to indemnify the
corporation against all liability." Within a few days Morad
conferred with Haddad about his commission. "At. first
Haddad denied that the sale had gone through, then he
said that he had not received the full price that he was
asking, and finally he told Morad that he had not produced
Baron as a customer."

· The exact amount received by Haddad did not appear
in any writing or document. When first shown the property
Baron offered $45,000 to Morad but Morad declined to
submit the offer as being too low. "A few days prior to
March 12, 1951, Haddad told [one] David [an attorney]
that the sale was going through, that Baron was to give

him a $25,000 mortgage but that before the parties went to the attorney's office for the closing of the sale, Baron would have to give him $25,000 at his place of business. After the sale was consummated Morad told Haddad that he understood that he had sold the property for $50,000. Haddad did not deny this figure but became evasive and started to complain about the price he had received for the automobiles . . .." At the hearing before the master a son of Joseph Baron, who is one of the present stockholders and an attorney at law, "declined to give the exact purchase price on the grounds of the attorney-client privilege." Joseph Baron was "evasive." He testified that the price was less than $50,000 but said "that he could not remember" whether it was more than $45,000.

The master's ultimate findings based on his subsidiary findings were that Morad produced "Baron as a customer for the property"; that "Baron bought the property"; that Morad "was the predominant, efficient cause of the sale"; that he was entitled to a commission; that Morad did not earn the commission of $10,000 which Haddad first mentioned because the buyer did not pay $60,000 for the property; that the sale price was $50,000; that the customary commission for the sale of property like that in question was 10% of the sale price; that Haddad intended to pay the commission personally (see *Johnstone* v. *Cochrane*, 231 Mass. 472, 477); and that he owed Morad $5,000.

On motion by the defendants the case was recommitted to the master for him to append to his report a "brief, accurate and fair summary" of so much of the evidence as bore upon the questions of law raised by the defendants' exceptions to the report which were as follows. "1. The evidence was insufficient in law — (a) To establish any liability to the plaintiff by the defendant corporation for commission. (b) To establish any liability to the plaintiff by the defendant Haddad for commission. (c) To enable the master to find that the plaintiff accepted employment as an agent, and communicated said acceptance to either defendant. (d) To enable the master to determine the sell-

ing price. (e) To enable the master to establish a selling price on which to base the plaintiff's compensation. (f) To entitle the plaintiff to a commission for selling personally. (g) To enable the master to find that the plaintiff had proven the allegations in paragraph 6 of the bill of complaint. 2. Because the master failed to find that the plaintiff was a member of a conspiracy to defraud the government, in which the plaintiff's part of the conspiracy was to supply a customer and did so." Paragraph 6 of the bill of complaint to which reference is made in (g) alleges a sale and transfer by the defendant of the land, buildings, business, and fixtures of the corporation to Baron and his nominees.

The report after recommittal was redrafted and by interlocutory decree was confirmed and the exceptions were overruled.

A final decree was entered ordering that the defendant Haddad pay to the plaintiff the sum of $5,000 with interest from June 7, 1951, to April 28, 1952, the date of the final decree. The decree contained an appropriate provision for the application of the mortgage note of the corporation toward the satisfaction of Haddad's indebtedness.

It appears from the report that Haddad offered to pay Morad a stipulated commission if he would produce a customer for the property of the corporation at a price of $60,000. See *John T. Burns & Sons Inc.* v. *Hands*, 283 Mass. 420, 422-423. Although Morad did not produce a customer who would pay this amount, he obtained a purchaser in the person of Baron who after somewhat protracted negotiations with Haddad bought all of the issued stock of the corporation at a figure acceptable to Haddad. *Blood* v. *Jenkins*, 312 Mass. 691. *Henderson & Beal, Inc.* v. *Saitz*, 327 Mass. 523, 524-525. Morad's employment was never terminated and Haddad's offer to pay a commission was reaffirmed during the negotiations. In order for Morad to earn a commission it was not necessary that the terms of the sale be those which were originally proposed. *Holton* v. *Shepard*, 291 Mass. 513, 516. *Pacheco* v. *Medeiros*, 292 Mass. 416, 420-421. *Green* v. *Warren Institution for Sav-*

*ings,* 312 Mass. 307, 308.  *Siegel* v. *Lowe,* 327 Mass. 154, 155.

The transfer of stock by Haddad effected the sale of the corporate property for which Morad had been employed to find a customer.  The corporation was owned by Haddad.  It was used by him as an agency through which he conducted business.  The sale of all of the stock of the corporation was in legal effect a sale of all of its assets, and the mere fact that the parties found it more convenient to transfer all of the stock rather than to make a conveyance of its assets does not change the substance of the transaction.  *Benedict* v. *Dakin,* 243 Ill. 384, 388.  See *Seward* v. *M. Seward & Son Co.* 91 Conn. 190; *Mills* v. *Miller,* 135 W. Va. 627.  Morad was entitled to the same commission which he would have earned had the corporate property been directly conveyed.

The apparent attempt of both Haddad and Baron to conceal the amount paid for the property made it difficult for the master to determine the exact purchase price.  We think in the circumstances he was justified in his conclusion that it was $50,000.

There is no merit in Haddad's contention that Morad participated in a scheme to defraud either the State or the Federal government or both by concealing the amount of the purchase payment.  There was nothing illegal in the latter's performance of the contract.  It does not appear from the record that Haddad failed to make an honest return for tax purposes of the sum which he received from Baron, but, if he did, Morad was not a participant in the fraud.

The exceptions of the defendants were rightly overruled.  There was no error in the interlocutory or in the final decree.

*Interlocutory decree affirmed.*
*Final decree affirmed with costs*
*of this appeal.*