## Richmond

### BURRUSS TIMBER COMPANY, INC.

### v.

### F. EARL FRITH, t/a, etc.

Record No. 820241.

January 18, 1985.

Present: Carrico, C.J., Cochran, Compton, Russell and Thomas, JJ., Harrison and Gordon, Retired Justices.

*David T. Petty, Jr. (Kizer, Phillips & Petty*, on briefs), for appellant.

*W.H. Jolly; Alton B. Prillaman (Jolly, Place, Fraln & Prillaman, P.C.*, on brief), for appellee.

RUSSELL, J., delivered the opinion of the Court.

In this action for the recovery of a real estate broker's commissions, the dispositive question is whether commissions are earned where a purchaser acquires all the stock of the corporate landowner, rather than taking title to its land by conveyance. We conclude that such a transaction is not a sale of land in the circumstances of the case before us and reverse a judgment for broker's commissions.

Burruss Land and Lumber Company, Incorporated (Burruss Land), was a closely held Virginia corporation based in Lynchburg, which operated two flooring plants and, at the time in question, owned some 120,000 acres of timber land in 300 parcels located in four southeastern states. In the middle 1970's, Burruss Land developed a cash flow problem and decided to sell its assets, either piecemeal or as an entirety.

F. Earl Frith, a real estate broker, had enjoyed a continuing business relationship with Burruss Land for a number of years. He had sold land for the corporation, acquired land for it, personally purchased land from it and, at the time in question, owned land jointly with William H. Burruss, Jr., its president. The corporation habitually referred its land transactions in Southwest Virginia to Frith, and he was paid commissions on those transactions which went to settlement. In some cases, he divided the commissions with other brokers who were involved in the transactions. After mid-1975, Frith acted under written exclusive listing agreements signed by Burruss Land. On June 21, 1977, Burruss Land gave Frith a written exclusive listing agreement covering 32 parcels which contained substantially all its remaining land in Southwest Virginia. Frith made about 25 sales under this agreement and received approximately $57,000 in commissions up to March 7, 1979.

On September 28, 1977, Burruss Land entered into a non-exclusive "open listing" agreement with United Farm Agency (United), a subsidiary of a large real estate company based in Kansas City, Kansas, for the sale of all its assets in all states. After an extensive advertising campaign, United attracted the principals in Boston/Lyme Timber Company (Boston/Lyme), a New England-based real estate investment company. Boston/Lyme made an extensive investigation of the value of the assets of Burruss Land. At the personal request of Mr. Burruss, Frith accompanied the agents of Boston/Lyme on a tour of six parcels of land, and, through an employee, furnished other assistance to United in its efforts to show some of the Southwest Virginia parcels to Boston/Lyme's agents.

Ultimately, Boston/Lyme entered into an agreement with the stockholders of Burruss Land whereby Boston/Lyme would purchase all the outstanding shares of stock in Burruss Land for $55,000,000. Settlement was held on March 7, 1979, at which time Burruss Land was merged into Boston/Lyme, and the name of the successor corporation was changed to Burruss Timber Company, Inc. (Burruss Timber). Frith claimed commissions on the value of the remaining unsold Southwest Virginia parcels of land which, he contended, had been listed with him at valuations totalling $8,800,000. Burruss Timber, denying that any sale of real estate had occurred, refused Frith's claim but negotiated a settle-

ment with United for its services by conveying to it a parcel of land valued at $500,000.

Frith brought this action against Burruss Timber for a 10% commission upon the value of the Southwest Virginia parcels which had passed from Burruss Land to Burruss Timber by virtue of the stock purchase and merger. After a bench trial, the court issued a written opinion holding: that Frith's exclusive listing agreement, which had lacked a termination date, had in fact expired, and Frith was therefore not entitled to commissions pursuant to the agreement; that Frith was nevertheless entitled to compensation on a *quantum meruit* theory; that although United was *the* procuring cause of the sale of all assets of Burruss Land, still Frith was *a* procuring cause of the sale of the Southwest Virginia parcels, which had a value of $8,800,000; that the stock transfer and merger in fact amounted to a sale of land, including those lands for which Frith was entitled to compensation; and that Frith was entitled to judgment, *quantum meruit*, in the amount of $80,000.

Frith relies here, as he did at trial, upon *Kingston Development Company, Inc.* v. *Kenerly,* 132 Ga. App. 346, 208 S.E.2d 118 (1974); *Morad* v. *Haddad,* 329 Mass. 730, 110 N.E.2d 364 (1953); *Seward* v. *M. Seward & Son Co.,* 91 Conn. 190, 99 A. 887 (1916); and *Benedict* v. *Dakin,* 243 Ill. 384, 90 N.E. 712 (1910), for the general proposition that the law looks to the substance of a transaction rather than to its form, and that a broker's right to commissions on a sale of land will not be defeated if the parties to the sale elect to achieve the same result by a sale of stock rather than by a conveyance.

In *Kingston,* a broker, employed to sell land which was a corporation's principal asset, found a willing buyer. Buyer and seller agreed, for tax reasons, to a "stock swap" whereby the seller corporation was transformed into a subsidiary of the buyer. Although the seller corporation retained title, the court held that the broker had accomplished the sale he was employed to make. Terming the ruling a "reverse piercing of the corporate veil," the court held that the commission was earned.

In *Morad,* the owner of a corporation employed a broker to sell all the corporate assets. The broker produced a buyer, but the owner, without consulting the broker, negotiated a sale of all the corporate stock to the buyer for a price lower than the listing and then denied that a sale had taken place. The court held that that

stock sale was, in legal effect, a sale of all the corporate assets, which was what the broker was employed to accomplish. Thus, the commission was earned.

In *Seward*, the receiver of a defunct corporation employed a broker to sell the principal remaining asset in receivership, a manufacturing plant. The receiver found a buyer who was able to purchase the plant on deferred payments, but not for cash. Thinking that he had no authority to sell land on credit, the receiver negotiated a sale of all the corporate stock to the buyer for deferred payments. The transaction was ratified by the court, which held that it was "substantially the equivalent" of a sale of land, and commissions were, therefore, authorized.

In *Benedict*, a broker was employed to sell all the assets of two corporations. Rather than making conveyances, the sellers negotiated a sale of all their stock to the buyer whom the broker had produced. The court held that the sale of stock was, in legal effect, a sale of all the corporate assets. It found the distinction between the form of the transactions "too finely drawn to be of practical value." Commissions were awarded to the broker.

The general principle which runs through this line of cases is inapposite here. In each case, the broker was employed to sell all, or substantially all, the assets of a corporate seller. In each case, a stock sale, exchange, or merger accomplished "substantially the equivalent" of the sale the broker was employed to make, regardless of the motivations of the parties. To disallow commissions in such a situation would be to permit form to triumph over substance.

Here, by contrast, Frith was not employed to sell all the assets of Burruss Land; Union was. Frith was given the exclusive right, during the term of his listing agreement, to sell 32 specific parcels of land in Southwest Virginia, representing approximately one-sixth of the value of all corporate assets. His position as a broker was, in fact, recognized as to these parcels, and he was paid commissions on individual sales until the date of the merger. When all the assets of Burruss Land, located in four states, were transferred by corporate merger for a consideration of $55,000,000, the transaction cannot be termed "substantially the equivalent" of the limited sales Frith was authorized to make. Because we conclude that the result accomplished by the stock sale and merger was not "substantially the equivalent" of the result Frith contracted to

achieve, it follows that the transaction did not amount to a "sale of land" upon which he was entitled to recover commissions.

The foregoing holding makes discussion of the remaining assignments of error unnecessary. We will, accordingly, reverse the judgment and enter final judgment here for Burruss Timber.

*Reversed and final judgment.*