Troy, Paul E., J.
This matter is before the court on the defendant’s, Heritage Property Investment Trust, Inc. (“Heritage”), Motion for Summary Judgment against the plaintiffs, Paul A. Donahue (“Donahue”) and Weston Associations, Inc. (“Weston”). Heritage has moved for summary judgment on the following six claims: Breach of Contract (Count I); Breach of the Covenant of Good Faith and Fair Dealing (Count II); Fraud In The Inducement (Count III); Promissory Estoppel (Count IV); Unjust Enrichment (Count V); and Violation of G.L.c. 93A (Count VI). For the following reasons, the defendant’s motion must be ALLOWED on Counts I, II, IV, and v. and DENIED on Counts III and VI.
Background
The following is a summary of the relevant facts from the summary judgment record viewed, for purposes of this motion, in the light most favorable to the plaintiffs as the non-moving party. In the early 1980s, Donahue provided real estate advice and services to NET Really Holding Trust, Inc. (“NETj, an affiliate of the New England Teamsters & Trucking Industry Pension Fund. Donahue provided these services subject to agreements that were entered into between Donahue and NET throughout the 1980s. Donahue contends that during this period he was retained to serve as a “real estate broker, consultant, finder, and financial advisor for NET,” and he received fees ranging from 0.75% to 1.25% of the selling price of the properties involved in any real estate transaction on which he worked.
The various letter agreements between Donahue and NET were authorized by the NET Board of Trustees (the “Board”). However, by the mid-1980s, Prendergast, as president of NET Properties Management, became the executive to whom the letter agreements were addressed. Prendergast was the primaiy contact for all work done by Donahue; he reviewed Donahue’s proposals to the Board and the two developed a close personal friendship of a “father-son” dynamic in addition to their professional relationship.
During the 1980s, Donahue attempted to facilitate the purchase by NET of some or all of the real estate holdings of Bradley Real Estate (“Bradley”). Like NET, Bradley owned multiple strip mall centers. NET asked Donahue to determined whether it might be possible for NET to purchase all of Bradley, but ultimately no transaction occurred at that time.
On July 21, 1992, Prendergast drafted and sent a letter (the “1992 Letter”) to Donahue ending the existing relationship between Donahue and NET under the prior letter agreements because the services formerly provided by Donahue had been brought in-house at NET. The 1992 Letter “encouraged” Donahue to “continue to work with NET on a brokerage commission basis to locate investment properties suitable for acquisition.”
Donahue continued to work on behalf of NET in an advisory capacity on various properties and investment opportunities. In 1997, NET asked Donahue to “reopen” discussions with Bradley about whether NET could acquire some or all of Bradley’s properties. Although Bradley expressed interest in purchasing NET, these discussions did not ultimately lead to the completion of any transaction.
In 1999, NET used what the plaintiffs contend was approximately $550 million in real estate investments and related assets to form Heritage, a private real estate investment trust (“REFT”). Prendergast was immediately named Chairman, President, and Chief Executive of Heritage upon its formation. During this period, Donahue remained in close communication with Prendergast and continued to offer his services whenever the need arose. Shortly thereafter, Prendergast expressly requested Donahue pursue an acquisition of Bradley’s properties on behalf of Heritage. Donahue immediately contacted members on the Bradley Board to facilitate a meeting between top executives from both companies.
After Donahue re-opened discussions between Heritage and Bradley, negotiations moved forward. During this time, Donahue contends that Prendergast repeatedly reminded him how much Prendergast had personally riding on the successful acquisition of Bradley by Heritage. At several points during the Bradley negotiations, Donahue contends that Prendergast told him “we’ll pull the old contracts out of the drawer” and that the deal was “very important to me, you’re going to get a good fee out of this, I’m going to do very well with this transaction.”
On January 26, 2000, Donahue sent a letter to Prendergast asking him to “recogniz[e] me as your broker/consultant and the introducing parting [sic].” On February 9, 2000, Mark Robinson (“Robinson”), Secretary for Heritage, replied to Donahue stating that Heritage recognized Donahue as “the introducing parly in connection with any transaction that may be entered into between Heritage Property Investment Trust, Inc. and the Bradley Real Estate, Inc. and completed within one year from the date of this letter” but not as Heritage’s “broker/consultant and the introducing [party].”
In the final weeks leading up to the finalization of the Bradley acquisition, the plaintiffs contend that Prendergast was unable to effectively communicate with the principal from Bradley and requested Donahue make himself available “twenty-four hours around the clock” and provide Prendergast with “every phone number where [Donahue] was going to be.” The plaintiffs contend that based on these representa *490 tions, Donahue accepted Prendergast’s request and continued to work with Bradley to facilitate the deal. The plaintiffs contend that along with large numbers of attorneys and investment bankers representing both parties, Donahue continued to provide his services throughout this period and facilitated discussions between the parties and reviewed critical documents.
On May 15, 2000, Heritage and Bradley signed a definitive merger agreement and publicly announced the transaction in which Heritage proposed to acquire all of Bradley’s outstanding stock for approximately $1.2 billion. The deal took the ultimate form as a stock acquisition and no real estate assets changed title as a result of the merger. Those assets continued to be owned by Bradley OP, which survived the transaction and continues to own those assets to this day. Following the parties’ Merger Agreement on May 15, 2000, Bradley and Heritage continued to negotiate substantive terms prior to closing the transaction. On August 31, 2000, the shareholders of Bradley approved the transaction laid out in the Merger Agreements to sell their shares to Heritage at $22 per share. On September 18, 2000, the transaction closed.
The plaintiffs, however, contend that when Donahue first became involved in the Bradley acquisition in the 1980s, the deal was being considered as a real estate purchase. The plaintiffs contend that Prendergast realized over $33 million in personal remuneration since Heritage successfully acquired Bradley.
Discussion
Entry of summary judgment is appropriate where there are no material facts in dispute and where the moving party is entitled to judgment as a matter of law. Highlands Ins. Co. v. Aerovox, Inc., 424 Mass. 226, 232 (1997). Mass.R.Civ.P. 56(c). Evidence submitted in connection with a motion for summary judgment is to be viewed in the light most favorable to the nonmoving party, and all permissible inferences must be drawn in that party’s favor. Girardi v. Gabriel, 38 Mass.App.Ct. 553, 554 (1995). In deciding a motion for summary judgment, the court may consider pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. Cmty. Nat'l Bank v. Dawes, 369 Mass. 550, 552 (1976). MassR.Civ.P. 56(c). The court should not weigh evidence, assess credibility, or find facts. The court may only consider undisputed material facts and apply them to the law. See Kelly v. Rossi, 395 Mass. 659, 663 (1985). Apariy moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case or by showing that the nonmoving party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. Gen. Motors Corp., 410 Mass. 706, 716 (1991).
The defendant argues that all of the plaintiffs’ claims should be dismissed for the following reasons: (1) the Statute of Frauds, G.L.c. 259, §7, exception to the writing requirement for commission agreements involving services performed by licensed real estate brokers or licensed real estate salesmen does not apply to transactions involving the sale of stock; (2) even if the G.L.c. 259, §7 licensed real estate broker exception applies to transactions involving the purchase or sale of stock, the exception does not apply in the present case because Weston was not licensed as a real estate broker until after the work on the Bradley acquisition was completed; and (3) the plaintiffs, having no protection from the Statute’s exception for licensed real estate brokers, have also failed to produce evidence in the summary judgment record which, viewed in the light most favorable to the plaintiffs, satisfies the Statute of Frauds. I turn first to the question of whether G.L.c. 259, §7’s exception for licensed real estate brokers applies to real estate transactions involving the purchase or sale of stock.[2]
I. The Applicability of G.L.c. 259, §7’s “Licensed Real Estate Broker Or Real Estate Salesman” Exception to Transactions Involving the Purchase or Sale of Any Stock
The Business Broker or Finder Section of the Statute of Frauds, G.L.c. 259, §7, states, in pertinent part, the following:
Any agreement to pay compensation for service as a broker or finder or for service rendered ... in negotiating the purchase, sale or exchange of a business, its good will, inventory, fixtures, or an interest therein, including a majority of voting interest in a corporation, shall be void and unenforceable unless such agreement is in writing, signed by the party to be charged therewith, or by some other person authorized. For the purpose of this section, the term “negotiating” shall include identifying prospective parties, providing information concerning prospective parties, procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. The provision of this section shall apply to a contract implied in fact or in law to pay reasonable compensation but shall not apply to a contract to pay compensation for professional services of ... a licensed real estate broker or real estate salesman acting in their professional capacity.
The defendant argues that G.L.c. 259, §7’s exception to the Statue of Frauds writing requirement (for commissions for licensed real estate brokers or salesmen) does not apply to any real estate transaction involving the purchase or sale of stock. Heritage relies on dicta in Turnpike Motors v. Newbury Group, Inc., 403 Mass. 291 (1998), in support of its argument. I turn now to *491 a review of the Supreme Judicial Court’s decision in Turnpike Motors and related statutes.
In Turnpike Motors, two automobile dealerships had agreed to a sale of assets that included an interest in real estate and tangible and intangible property. Turnpike Motors, 403 Mass. at 292. The broker was unlicensed to sell real estate pursuant to G.L.c. 112, §87RR (1986 ed.).[3] However, the sellers assured the broker that since the sellers planned to effectuate the deal via a sale of corporate stock, the broker would not need a real estate license. Nevertheless, after the stock sale the sellers moved to enjoin the broker from interfering with the sale, arguing that G.L.c. 112, §87RR precluded the unlicensed broker from recovering a commission. The lower court granted summaiy judgment for the sellers. On appeal, the broker successfully argued that the sellers should be estopped from denying the broker’s commission on the real estate portion of the sale because the sellers had assured the broker that it would not need a real estate license.
The Turnpike Motors court found that if the facts were as the broker contended, the sellers would be estopped from denying the broker a commission on the sale of the real estate. The court did not reach a decision on whether, in the normal course, a broker must be licensed under G.L.c. 112, §87RR to receive a commission on the full sale price of a business when the assets included an interest in real estate, because the decision was based on the broker’s estoppel argument. However, the Turnpike Motors court discussed the matter further in footnote five of the decision. The defendant’s claim that, as a matter of law, G.L.c. 259, §7’s licensed real estate broker or real estate salesperson exception does not apply to any transactions involving the purchase or sale of stock is based largely on its interpretation of this discussion. I turn now to a review of the discussion in footnote five.
The SJC reasoned that “the argument that a full commission is collectible [absent a broker’s license under §87RR] would rely on implications that the Legislature did not intend §87RR’s licensure requirement to apply to the sale of a business, a situation in which the seller is typically more sophisticated than is a homeowner.” Turnpike Motors, 403 Mass. at 293, n.5. One such implication is “the Legislature’s separate treatment of business brokers (see G.L.c. 259, §7 [1986 ed.]), requiring enforceable commission agreements of business brokers to be in writing and signed).” Id. Another indication of the Legislature’s intent is that “G.L.c. 112, §87QQ (1986 ed.) . . . states that §87RR does not apply to a person dealing in stock and thus suggests that the sale of a business, or at least a corporation or its assets, is not within the scope of §87RR. See Morad v. Haddad, 329 Mass. 730, 735 (1953), treating the sale of the stock of a corporation as the same in legal effect as the sale of all of its assets.” Turnpike Motors, 403 Mass. at 293, n.5.
The SJC continues, suggesting that “it is perhaps not a coincidence that when the statutes concerning the registration of real estate brokers and salesman were adopted four years after the Morad opinion . . . the provision concerning the inapplicability of §87RR to stock transactions was included.” Id. The defendant argues that with this statement, the SJC has indicated that both the Legislature’s intent for, and the legal effect of, the post-Morad statutes was to supersede the Morad opinion, and, ultimately, to exclude transactions involving “any stock” from the definition of real estate brokerage or sales services. However, after consideration, this court interprets the post-Morad statutes as consistent with the holding in Morad.
In Morad, the plaintiff was a licensed real estate broker. The plaintiff and the defendant seller entered into an agreement whereby the plaintiff would produce a buyer to purchase the defendant’s real and personal property for $60,000. The plaintiff introduced a purchaser to the defendant, but the purchaser refused to acquire the land for $60,000. However, after protracted negotiations between the defendant and the purchaser, the purchaser agreed to buy all of the issued stock of the defendant’s corporation. Thereafter, the defendant refused to pay the plaintiff a commission on the sale.
On appeal, the SJC upheld the lower court’s decision in favor of the plaintiff. The SJC reasoned that “[t]he transfer of stock by [the defendant] effected the sale of the corporate property for which [the plaintiff] had been employed to find a customer . . . The sale of all of the stock of the [seller’s] corporation was in legal effect a sale of all of its assets, and the mere fact that the parties found it more convenient to transfer all of the stock rather than to make a conveyance of its assets does not change the substance of the transaction . . . [The plaintiff] was entitled to the same commission which he would have earned had the corporate property been directly conveyed.” Morad, 329 Mass. at 735 (internal citations omitted). The SJC refused to allow the seller to avoid paying the broker’s commission on the sale of property by changing the “substance of the transaction” from one of a real estate conveyance to a stock sale. Id.
The rationale behind the Morad opinion is consistent with the legal effect and presumed legislative intent of G.L.c. 259, §7 and G.L.c. 112, §87RR. Although G.L.c. 259, §7 prohibits a business broker or finder from recovering a commission without a written agreement, it also provides protection to certain enumerated professionals (i.e., attorneys, licensed real estate brokers, and licensed real estate salesmen affiliated with licensed brokers) who might work on a business deal that originates as a real *492 estateconveyance, onlytobeultimatelyconsummated as a stock transfer. Thus, the Statute of Frauds protects licensed real estate brokers or salesmen working in their professional capacity from a situation similar to that in Morad, where the form of a real estate acquisition changes. Therefore, the defendant’s argument that the plaintiffs’ claims should be dismissed because c. 259, §7’s licensed real estate broker exception, as a matter of law, is inapplicable to cases involving the sale or purchase of stock, is incorrect.
II. The Applicability of G.L.c. 259, §7’s “Licensed Real Estate Broker Or Real Estate Salesman” To Weston
However, even assuming that G.L.c. 259, §7’s “Licensed Real Estate Broker Or Real Estate Salesman” exception applies to a real estate transaction that ultimately takes the form of the purchase or sale of stock, as the plaintiffs contend occurred in the present case, the plaintiffs must show that they were, as a matter of law, licensed real estate brokers at the time they performed their services for the defendant, in order for this exception to apply. Only upon this showing would the Statute’s exception for licensed real estate professionals obviate the need for the commission agreement between the plaintiffs and the defendant to be in writing.
In the present case, even in the light most favorable to the plaintiffs, as the non-moving party, this court finds nothing in the record to suggest that Weston was licensed as a real estate broker pursuant to G.L.c. 112, §87RR prior to performing services for the defendant. The plaintiffs’ “Application For Licensure As A Massachusetts Real Estate Corporate, Partnership, LLP, Or LLC Broker,” submitted to the Division or Registration, Board of Registration of Real Estate, Brokers and Salespeople, was not prepared until May 10,2000. The document was not signed by Donahue until June 14, 2000. Lastly, Weston’s license as a “real estate broker” was not issued until July 3, 2000. There is nothing in the record that could support a fact finder’s inference that Weston was licensed as a real estate broker in the course of work performed for the defendant on the Bradley transaction. Therefore, the defendant’s Motion for Summary Judgment cannot be defeated on the basis of G.L.c. 259, §7’s exception for “licensed real estate brokers,” even assuming that the exception applies to transactions involving the sale or purchase of stock.
III. The Applicability of G.L.c. 259, §7’s “Licensed Real Estate Broker Or Real Estate Salesman” Exception To Donahue
I have also considered whether, in the light most favorable to the plaintiff, G.L.c. 259, §7’s “Licensed Real Estate Broker Or Real Estate Salesman” exception would apply where, as here, Donahue was licensed as a real estate salesman at the time services were performed for the defendant while Weston was unlicensed. I turn now to a closer review of the relevant real estate professional licensing statute and the case law.
General Laws Chapter 112, §87RR states, in pertinent part:
No salesman may conduct or operate his own real estate business nor act except as the representative of a real estate broker who shall be responsible for the salesman and who must approve the negotiation and completion by the salesman of any transaction or agreement which results in or is intended to result in the sale, exchange, purchase ... of any real estate ... No salesman shall ... be entitled to any fee, commission or other valuable consideration or solicit or accept the same from any person except his licensed broker in connection with any such agreement or transaction.
The licensing statute is clear that where, as in the present case, a real estate salesman is not affiliated with a licensed real estate broker, the salesman is not entitled to any fee or commission.
If the Statute leaves any doubt as to the Draconian result that the Legislature contemplated and intended for non-compliance with the real estate licensing statute, the case law does not. In Daunis v. Eastland Partners, Inc., 1994 Mass.App.Div. 196, 196-97 (1994), the Appellate Division upheld the lower court’s allowance of the defendant’s motion to dismiss on the basis of G.L.c. 112, §87RR. The parties had stipulated that the plaintiffs were not licensed real estate brokers. The parties had entered into an agreement whereby the plaintiffs would receive two percent of the sales price for each lot in a subdivision if they would refer qualified friends to the defendant as buyers. The plaintiffs, “as a direct result of those representations and in reliance thereon, made exhaustive and successful efforts in obtaining buyers ...” Eastland Partners, 1994 Mass.App.Div. at 196. “Unfortunately for the plaintiffs the statute is clear. It bars recovery in a suit if the broker or salesperson is not licensed. To allow plaintiffs to bring suit in the face of the statute would be to emasculate the statute. That would be against public policy and should not be done. Id. at 196-97 (emphasis added).
Similarly, in Albert-Hopkins Corp. v. Caputo, 357 Mass. 765, 765 (1970), in an action to recover a broker’s commission, the Court stated that “[i)t was a prerequisite to the plaintiffs recovery ‘in any suit or action’ that it has been ‘a duly licensed broker at the time such services were performed.’ ” Albert-Hopkins Corp. v. Caputo, 357 Mass. at 765, quoting G.L.c. 112, §87RR. Finding that “[t]he record disclose[d] no evidence whatever that the plaintiff corporation was licensed to act as a real estate broker,” the Court held that there was, accordingly, “no error in directing a *493 verdict for the de fendants.” Albert-Hopkins, 357 Mass. at 765.
I recognize that in the Commonwealth, the lack of a statutory license does not always preclude recovery under the terms of an otherwise legal contract. Compare, for example, the present case with the SJC’s decision in Town Plan. & Eng’g Assocs. v. Amesbury Specialty Co., 369 Mass. 737 (1976). In Amesbury Specialty, the plaintiff, an engineering firm, alleged breach of contract against the defendant. The defendant’s answer set out several defenses, one of which was that the plaintiffs’ performance on the contract was illegal because the plaintiffs’ president was not a licensed engineer, in violation of the licensing statute, G.L.c. 112, §8 IT. The Court reasoned that the violation of the statute did not preclude recovery under the terms of the contract, even though performance by the plaintiff under the contract was illegal. “Violation of the statute, aimed in part at least at enhancing public safety, should not be condoned. But we have to ask whether a consequence, beyond the one prescribed by statute, should attach, inhibiting recovery of compensation ...” Amesbury Specialty, 369 Mass. at 745.
The Amesbury Specialty opinion decided the case after taking into account all the circumstances of the contract and the performance. In so doing, the SJC explicitly distinguished the engineering practice licensing statute, G.L.c. 112, §81T, from the real estate brokers and real estate salesmen licensing statute invoked in the present case. “There is no provision [in G.L.c. 112, §8IT], as in the case of an unlicensed real estate broker (G.L.c. 112, §87RR), for loss of compensation by one who unlawfully engages in engineering practice. Amesbury Specialty, 369 Mass. at 747, n.7.
In the present case, even in the light most favorable to the plaintiffs, as the non-moving party, this court can find nothing in the record to suggest that Weston was licensed as a real estate broker prior to July 3, 2000. Donahue, while indisputably licensed as a real estate salesman at all relevant times, was not affiliated with a licensed real estate broker. The cases that have dealt with similar situations involving unlicensed real estate brokers have refused to award the broker’s commission. The cases have involved situations where both sides stipulated to the existence of a written commission agreement, where there was full performance on the part of the unlicensed broker, and where the defendant would be unjustly enriched. Nevertheless, the cases have consistently denied recovery for the unlicensed real estate brokers.
Moreover, in the present case, Donahue was not merely a licensed real estate salesman who, after a disputed sales commission, discovered that he was affiliated with an unlicensed real estate broker. He was aware, and was in fact responsible, for Weston’s failure to be licensed under Chapter 112, §87RR and should not be allowed to circumvent the plain meaning and intent of the statute simply by trading in his hat as president of Weston for the hat of a Weston real estate salesman. For the foregoing reasons, G.L.c. 259, §7’s “Licensed Real Estate Broker Or Real Estate Salesman” exception does not apply in the present case. Therefore, the defendant’s Motion for Summary Judgment cannot be defeated on the basis of G.L.c. 259, §7’s exception for “Licensed Real Estate Broker Or Real Estate Salesman.”[4]
IV. Whether the Writings Satisfy the Statute of Frauds
The plaintiffs have argued, alternatively, that viewed in the light most favorable to them as the non-moving party, there remains a genuine factual dispute as to whether G.L.c. 259, §7’s writing requirement has been satisfied. “A memorandum to satisfy the statute of frauds need not be a formal document intended to serve as a memorandum of the contract: but it must contain the terms of the contract agreed uponthe parties, the locus (if an interest in real estate is dealt with), in some circumstances the price . . . and it must be signed by the party to be charged or by one authorized to sign on his behalf. Des Brisay v. Foss, 264 Mass. 102, 109 (1928) (internal citations omitted). Moreover, it is well established that the memorandum need not consist of one document, but may consist of several documents, which, taken together, contain the necessary information. See, e.g., Schmoll Fils & Co., Inc. v. Wheeler, 242 Mass. 464, 469-70 (1922) (holding that correspondence between plaintiff and defendant taken as a whole satisfied the Statute).
“[I]n order for a writing to satisfy the Statute of Frauds it must contain directly, or by implication, all of the essential terms of the parties’ agreement.” Simon v. Simon, 35 Mass.App.Ct. 705, 709 (1994). “The writing offered to satisfy the Statute of Frauds must set forth [the] essential element[s] with reasonable certainty.” Id. at 709, citing to Restatement (Second) of Contracts §131(c) (1979). “Nor can proof of an essential term that has been omitted from a written document be established by parol evidence.” Christo v. Draper, 55 Mass.App.Ct. 1108, 1108 (2002). Thus:
[u]nless the writing, considered alone, expresses the essential terms with sufficient certainty to constitute an enforceable contract, it fails to meet the demands of the statute. Accordingly, where the Statute of Frauds, rather than the parol evidence rule is invoked, it follows that recovery may not be predicated upon parol proof of material terms omitted from the written memorandum, even though the oral understanding is entirely consistent with, and in no way tends to vary or contradict, the written instrument.
*494 Simon, 35 Mass.App.Ct. at 711, quoting Ellis v. Klaff, 96 Cal.App.2d 471, 477 (1950). However, “(pjarticularly in the context of a complex commercial transaction, we have had occasion to caution against the transformation of general expressions of intent, when significant details remain to be resolved, into legally binding agreements.” Pappas Industrial Parks, Inc. v. Psarros, 25 Mass.App.Ct. 596, 599 (1987).
The plaintiffs have submitted correspondence which, they contend, satisfies the Statute of Frauds. The first letter submitted as part of the summary judgment record and relied upon by the plaintiffs in support of their argument was dated July 21, 1992 and was sent from Prendergast to Donahue. It states, in pertinent part, the following:
Effective September 21, 1992, we are terminating the existing agreement between Weston Associates, Inc. and Net Realty Holding trust, as set forth in your letters of November 4, 1982, August 9, 1985, and May 1, 1986. As we discussed, the decision to terminate the agreements is not in any way attributable to an assessment of your performance, which has been exemplary over the years. From this point forward, the analysis and recommendation of acquisitions and sales will be performed in-house, rather than by an outside consulting company.
Of course, we encourage you to continue to work with us on a brokerage commission basis, to locate investment properties suitable for acquisition by the Trust.
In addition, the record includes a January 26, 2000 letter from Donahue to Prendergast which states, in pertinent part, the following:
As per your instruction I have re-opened the door with Bradley Real Estate. I feel that with the new management team in place and my contacts on the Bradley board the chances of putting a deal together are much better than in the past.
As we discussed I will continue to work as your Broker/consultant. I feel that with my contacts I will be very helpful in the negotiations and formulation of a deal.
At this point I request that you send me the letter we discussed recognizing me as your broker/consultant and the introducing parting [sic].
Mark Robinson, Secretary for Heritage, replied on February 9, 2000 to Donahue as follows:
This is to acknowledge on behalf of Heritage Property Investment Trust, Inc. that you are to be recognized as the introducing party in connection with any transaction that may be entered into between Heritage Property Investment Trust, Inc. and the Bradley Real Estate, Inc. and completed within one year from the date of this letter. It is understood and agreed that compensation for these services will be negotiated at market between you and Thomas Prendergast on behalf of Heritage.
“Whether a writing satisfies the Statute of Frauds is a question of law.” Simon, 35 Mass.App.Ct. at 709. In the present case, reading all of these documents together and in the light most favorable to the plaintiffs as the non-moving party, the Statute of Frauds’ writing requirement was not satisfied. I accept, for purposes of this motion, that the essential terms outlined in Robinson’s letter are sufficient to satisfy the Statute. I also assume that the signatory to the document, Robinson, was authorized by Heritage to bind the company in a broker’s commission agreement. Furthermore, I assume that the consideration for the agreement, which the letter establishes will be “negotiated at market” between Donahue and Prendergast could be supplied by reasonable implication and, assuming the other essential terms of the contract were in writing, would ultimately be for a finder of fact to determine.
Nevertheless, it is axiomatic that an “acceptance must comply with the requirements of the offer as to the performance to be rendered. Restatement (Second) of Contracts §58 (1981); Tierney v. Wellington Carpets, Inc., 8 Mass.App.Ct. 237, 240 (1979) (explaining that if an acceptance substantially varies from the terms of the offer, it is ineffective, thus creating no binding agreement). In the present case, based on the writings included in the summary judgment record, the February 9, 2000 letter was not an acceptance of the January 26, 2000 letter but rather a counter-offer. Donahue’s letter to Heritage requested that the defendant recognize the plaintiffs as the ’’broker/consultant and the introducing parting [sic]" for the Bradley acquisition. However, Heritage’s February 9, 2000 letter to the plaintiffs instead recognizes Donahue and Weston only as Heritage’s “introducing party.” The difference between a commission for a “broker/consultant and the introducing party” and that of an “introducing party” is not insignificant and is substantially different from the terms of the January 26, 2000 letter so as to operate as a rejection and counter-offer.
Moreover, the 1992 letter from Prendergast (on behalf of Net and not Heritage) to Donahue to “continue to work with us on a brokerage commission basis” cannot be read as an open-ended offer to which Donahue accepted with his January 26, 2000 letter. “An offeree’s power of acceptance is terminated at the time specific in the offer, or, if no time is specified, at the end of a reasonable time.” Restatement (Second) of Contracts §41. Even assuming the 1992 letter can be considered as an offer, which, given its lack of essential terms it cannot, viewing the letters in the record in the light most favorable to the plaintiffs, a reasonable finder of fact could not consider the eight-year gap between the *495 1992 letter and the January 26,2000 letter a “reasonable time” to accept an offer.
Therefore, reading all of the writings in the record together, and assuming that consideration for the agreement could be reasonably implied, there is nevertheless nothing in the record, viewed in the light most favorable to the plaintiffs, to satisfy the Statute of Frauds. Therefore, the defendant’s motion for summary judgment cannot be defeated on the basis of the plaintiffs’ satisfaction of G.L.c. 259, §7.
V. Whether the Doctrine of Equitable Estoppel Bars Heritage’s Statute of Frauds Defense
The plaintiffs’ argue that even if (1) G.L.c. 259, §7’s exception for licensed real estate brokers and salesman does not apply and (2) the summaiy judgment record fails to show that there is a genuine issue of material fact regarding whether the plaintiffs satisfied the Statute of Frauds’ writing requirement, Donahue’s detrimental reliance on Prendergast’s oral promises estops the defendant from asserting the Statute of Frauds as a defense.
There is no Massachusetts case that addresses this particular issue. The Massachusetts cases that have interpreted G.L.c. 259, §7 have held that the statute should be interpreted broadly to cover disputes over commissions on oral contracts in all brokerage contexts. “Introduction in 1985 of the special business brokerage Statute of Frauds [G.L.c. 259, §7] manifested a legislative purpose to discourage claims for commission based on conversation which persons heard differently or remembered differently.” Alexander v. Berman, 29 Mass.App.Ct. 458, 462 (1990). “Indeed, apart from [the] express exceptions, we do not find in the statute any basis for concluding that the Legislature intended to obviate disputes over claimed commissions for services rendered in certain commercial brokerage contexts, but not others.” Bay Colony Marketing Co. v. Fruit Salad, Inc., 41 Mass.App.Ct. 662, 667 (1996), rev. denied, 424 Mass. 1101 (1996).
In several cases, the courts of the Commonwealth have allowed plaintiffs to use the theoiy of detrimental reliance to avoid the penalties of the Statute of Frauds. However, the vast majority of those cases involved the sale of real estate where a buyer detrimentally relies on a seller’s oral promise to convey real estate. In those cases, courts have found that reliance estops the seller from claiming the Statute of Frauds as a defense. See Cellucci v. Sun Oil Co., 2 Mass.App.Ct. 722 (1974), aff'd, 368 Mass. 811 (1975); see also, Hickey v. Green, 14 Mass.App.Ct. 671 (1982).
If the plaintiffs’ case was governed by c. 259, §1, as are the aforementioned real estate cases, his equitable estoppel argument might serve to defeat the Statute of Frauds. However, where, as here, the case falls under G.L.c. 259, §7, equitable or promissory estoppel arguments offer no relief. The plain language of G.L.c. 259, §7 states that the “provisions of this section shall apply to a contract implied in fact or in law to pay reasonable compensation . . .”[5] (Emphasis added.) Significantly, the other Statute of Fraud sections include no such language. Where, as here, the statute explicitly includes within its scope, claims of promissoiy estoppel asserted as alternative claims to breach of contract, the legislature has effectively decreed that, as to business brokers and finders, estoppel claims will not render the statute inapplicable to oral commission contracts. It is also noteworthy that, while plaintiffs in both Berman, supra, 29 Mass.App.Ct. 458, and Bay Colony, supra, 41 Mass.App.Ct. 662, apparently did not assert estoppel, each plaintiff alleged that he had performed under the alleged oral broker’s agreement, and each agreement was nevertheless held to be within c. 259, §7. Therefore, the defendant’s Motion for Summaiy Judgment cannot be defeated on grounds of equitable estoppel and, for the foregoing reasons, the motion for summaiy judgment for the plaintiffs’ breach of contract claims: Breach of Contract (Count I); Breach of Contract (Duty of Good Faith and Fair Dealing) (Count II); Promissoiy Estoppel (Count IV); and Unjust Enrichment (Count Vj must be ALLOWED.
VI. The Plaintiffs’ Chapter 93A and Fraud in the Inducement Claims
The Statute of Frauds makes certain oral contracts unenforceable. However, it does not bar enforcement of eveiy single cause of action emanating from the unenforceable contract. The defendant correctly states that the mere breach of a contract, without more, does not amount to a Chapter 93A violation. Madan v. Royal Indem. Co., 26 Mass.App.Ct. 756, 762 (1989). Further, it would be against public policy for this court to enforce a contract that is unenforceable due to the Statue of Frauds through a Chapter 93A claim, where the action is based solely upon a simple breach of an oral agreement, full performance, or unjust enrichment. Id. at 763. “Therefore, in order to show a violation of c. 93A, the plaintiff must show ‘unfair or deceptive acts or practices,’ other than the breach.” Id. Thus, the Statute of Frauds does not bar a Chapter 93A claim based upon deceptive acts apart from the breach of the oral agreement.
In the present case, the summaiy judgment record, again viewed in the light most favorable to the plaintiffs, reveals more than a breach of an oral agreement. The plaintiff contends that Prendergast repeatedly assured Donahue that he would be paid for his services on the Bradley acquisition. Donahue contends that Heritage used his services without compensating him at fair market value. While, as a matter of law, Donahue may not rely on theories of promissoiy estoppel, full performance, or unjust enrichment to avoid the harsh penalties required by *496 the Statute of Frauds, G.L.c. 259, §7, the factual disputes surrounding these theories are nevertheless relevant as they apply to the plaintiffs’ c. 93A and Fraud in the Inducement claims. If accepted by a finder of fact, they could amount to unfair or deceptive practices beyond the mere breach of an oral agreement.
Since the plaintiffs’ c. 93A claims are not derivative solely from the breach of contract claims, viewed in the light most favorable to the plaintiffs, summary judgment for the defendant is inappropriate. Therefore, the defendant’s Motion for Summary Judgment is for the plaintiffs’Violation of G.L.c. 93A claim (Count VI) is DENIED.
Similarly, the plaintiffs argue that even absent recovery under their breach of contract claims, there remains a genuine issue of material fact as to whether the defendant induced Donahue to enter into an oral agreement and provide services that Donahue would be unable, and have no contractual basis upon which, to recover. The plaintiff relies on Prendergast’s repeated assurances to Donahue that he would be paid for his services on the Bradley deal and the fact that he was allowed to continue to perform services on the deal subsequent to Heritage’s counter-offer, to which there was never a written acceptance. Viewed in the light most favorable to the plaintiffs, a finder of fact could reasonably infer that either Heritage or Prendergast knew, or should have known, that the parties had not entered into a binding contract and nevertheless allowed and encouraged Donahue to continue to provide them with his services. As with the plaintiffs’ c. 93A claims, this claim exists independent of the plaintiffs’ breach of contract claims and, therefore, the defendant’s Motion for Summary Judgment on the plaintiffs’ claim for Fraud in the Inducement (Count III) is DENIED.
ORDER
For all of the foregoing reasons, the defendant’s, Heritage Properly Investment Trust, Inc., Motion for Summary Judgment on the plaintiffs’, Paul J. Donahue and Weston Associates, Inc., claims for: Breach of Contract (Count I); Breach of Contract (Duty of Good Faith and Fair Dealing) (Count II); Promissory Estoppel (Count IV); and Unjust Enrichment (Count V) is ALLOWED. The defendant’s Motion for Summary Judgment on the plaintiffs’ claims for Fraud in the Inducement (Count III) and Violation of G.L.c. 93A (Count VI) is DENIED.

A threshold question is whether the Statute of Frauds, G.L.c. 259, §7, applies to this matter. Although the summary judgment record supports the finding that the plaintiffs were “business brokers” or “business finders” in the context of their services for the defendant, I have also considered whether the record, viewed in the light most favorable to the plaintiffs, might support any alternative claims on which a reasonable finder of fact could find for the plaintiffs against the defendant.

G.L.c. 112, §87RR, “License; completion of transactions; fee or commission; action for compensation” for real estate brokers and salesman states, in pertinent part, the following:
Except as otherwise provided, no person shall engage in the business of or act as a broker or salesman directly or indirectly, either temporarily or as an incident to any other transaction, or otherwise, unless he is licensed. No salesman may conduct or operate his own real estate business nor act except as the representative of a real estate broker who shall be responsible for the salesman and who must approve the negotiation and completion by the salesman of any transaction or agreement which results or is intended to result in the sale, exchange, purchase, renting or leasing of any real estate ... No salesman . . . shall be entitled to any fee, commission or other valuable consideration or solicit or accept the same from any person except his licensed broker in connection with any such agreement or transaction... Except as otherwise provided no person shall recover in any suit or action in the courts of the Commonwealth for compensation for services as a broker performed within the Commonwealth unless he was a duly licensed broker at the time such services were performed . . .

The record reflects that the Massachusetts Appeals Court earlier reversed a dismissal of the plaintiffs’ complaint which was entered on November 29, 2002 (Connolly, J.). 11711116 I recognize that the Appeals Court did not base its decision solely on the plaintiffs’ contention to the Appeals Court that “Plaintiffs’ business is, and always has been, to provide services as licensed real estate brokers,” the Appeals Court nevertheless relied on the plaintiffs’ contention in making its decision. (Emphasis added.) Specifically, the Appeals Court stated in its July 13, 2004 unpublished opinion that the Superior Court “judge erred in [dismissing Donahue’s complaint], if for no other reason than that G.L.c. 259, §7, expressly excludes from its ambit the services of a ‘licensed real estate broker’... Fairly construed, Donahue’s complaint alleged that the services provided to Heritage were in the context of Donahue’s involvement with Heritage and its predecessor as ‘a broker ... in the purchase and/or sale of real estate.’ ” In addition, the plaintiffs’ papers to the Appeals Court explicitly stated that “THE LOWER COURT IMPROPERLY CONCLUDED THAT THE BUSINESS BROKERS STATUTE OF FRAUDS APPLIED TO THE PLAINTIFFS’ SERVICES AS REAL ESTATE BROKERS...” (Emphasis added.) Although there may have been a question of fact as to whether, in the light most favorable to the plaintiffs, G.L.c. 259, §7’s exception to the Statute of Frauds writing requirement for licensed real estate brokers or salesmen applies to real estate transactions that ultimately take the form of a stock acquisition, as this court has concluded, the plaintiffs’ contentions to the Appeals Court that Weston was, and always has been, a “licensed real estate broker,” for the purpose of invoking c. 259, §7’s exception was, at best, mistaken, and at worst, deceptive.

Claims of promissory estoppel, equitable estoppel, and quantum meruit are all claims under “a contract implied in fact or in law,” within the meaning of G.L.c. 259, §7. Cf. Loranger Const. Corp. v. E.F. Hauserman Co., 6 Mass.App.Ct. 152, 156-59 (applying earlier theory of promissory estoppel in charitable subscription cases, Massachusetts courts “purported to find consideration by the charity for the promise”; reasonable detrimental reliance is sufficient to enforce even a promise that does not meet formal requirements necessary to constitute an offer); Lonnquist v. Lammi, 240 Mass. 371, 374 (where there is no express contract, “the law implies an obligation to pay for what has been done . ..”).