JULIA R. SWORDS TRUST, TRANSFEREE, MARGARET R. MACKELL, DOROTHY R. BROTHERTON, AND JULIA R. SWORDS, CO-TRUSTEES, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 10882–10, 10883–10, 10884–10, 10885–10.　　　　Filed May 29, 2014.

R issued notices of transferee liability to Ps to collect D's unpaid Federal income tax pursuant to I.R.C. sec. 6901. R argues that the following two-step analysis applies in determining whether Ps are liable for D's unpaid tax: (1) analyze whether the subject transactions are recast under Federal law, here primarily the Federal substance over form doctrine, and then (2) apply State law to the transactions as recast under Federal law. *Held*: I.R.C. sec. 6901 requires that the Court apply State (rather than Federal) law to determine whether a transaction is recast under a substance over form (or similar) doctrine. *Held*, *further*, R has failed to establish

---

[1] Cases of the following petitioners are consolidated herewith: David P. Reynolds Trust, Transferee, Margaret R. Mackell, Dorothy R. Brotherton, and Julia R. Swords, Co-Trustees, docket No. 10883–10; Margaret R. Mackell Trust, Transferee, Margaret R. Mackell, Dorothy R. Brotherton, and Julia R. Swords, Co-Trustees, docket No. 10884–10; and Dorothy R. Brotherton Trust, Transferee, Margaret R. Mackell, Dorothy R. Brotherton, and Julia R. Swords, Co-Trustees, docket No. 10885–10.

that an independent basis exists under applicable State law or State equity principles for holding Ps liable for D's unpaid tax.

*Timothy L. Jacobs* and *William Lee S. Rowe*, for petitioners.

*Randall L. Eager, Jr.*, *Timothy B. Heavner*, *Matthew S. Reddington*, *James R. Rich*, *Kristina L. Rico*, and *Johnny C. Young*, for respondent.

MARVEL, *Judge*: These consolidated cases concern separate notices of liability that respondent issued to the cotrustees of the Julia R. Swords Trust (Swords Trust), the David P. Reynolds Trust (Reynolds Trust), the Margaret R. Mackell Trust (Mackell Trust), and the Dorothy R. Brotherton Trust (Brotherton Trust) (collectively, petitioner trusts). [2] Respondent determined in the notices that petitioner trusts are liable as transferees for Davreyn Corp.'s (Davreyn) Federal income tax deficiency of $4,602,986, [3] additions to tax under section 6651(a)(1) and (2) [4] of $1,160,137 and $1,982, respectively, an accuracy-related penalty under section 6662 of $920,597, fees of $50, and related interest for Davreyn's taxable year ended (TYE) February 15, 2001. The amount of each petitioner trust's transferee liability as calculated by respondent is as follows: Swords Trust—$3,833,988, Reynolds Trust—$2,710,241, Mackell Trust—$3,833,988, and Brotherton Trust—$3,833,988. These calculated liabilities stem primarily from respondent's determination recharacterizing petitioner trusts' February 15, 2001, sales [5] of their Davreyn stock as a sale of assets by Davreyn followed by Davreyn's distribution of its assets to petitioner trusts in liquidation.

The sole issue for decision is whether petitioner trusts are liable as transferees under section 6901 for Davreyn's unpaid

---

[2] The cotrustees of each of these trusts are Margaret R. Mackell, Dorothy R. Brotherton, and Julia R. Swords.

[3] Some monetary amounts have been rounded to the nearest dollar.

[4] Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code, as amended, and Rule references are to the Tax Court Rules of Practice and Procedure.

[5] Our use in the findings of fact of "sale", "purchase", and similar words generally is for convenience and is not intended to, and does not, constitute a finding that the referenced transactions were valid transactions recognized for Federal income tax purposes.

Federal income tax liability for Davreyn's TYE February 15, 2001. We hold that petitioner trusts are not liable as transferees under section 6901.

FINDINGS OF FACT

Some facts have been stipulated and are so found. The stipulations of fact and the facts drawn from stipulated exhibits are incorporated herein by this reference. When the petitions were filed, each petitioner trust had a mailing address in Virginia. Also at that time, Ms. Mackell and Ms. Brotherton resided in Virginia, and Ms. Swords resided in Kentucky.

I. *The Reynolds Family and Petitioner Trusts*

In 1919 Richard S. Reynolds, Sr., founded the Reynolds Metal Co. (Reynolds Metal). Reynolds Metal produced the popular aluminum foil brand, Reynolds Wrap. Headquartered in Richmond, Virginia, Reynolds Metal was, at one time, the third largest aluminum company in the world.

David Parham Reynolds (Mr. Reynolds), who died on August 29, 2011, was the son of Richard S. Reynolds, Sr., and the sole beneficiary of the Reynolds Trust. The Reynolds Trust was established by an instrument of indenture dated May 14, 1932.

Mr. Reynolds' only children are his daughters: Ms. Swords, Ms. Mackell, and Ms. Brotherton. Ms. Swords and her descendants are the sole beneficiaries of the Swords Trust. Ms. Mackell and her descendants are the sole beneficiaries of the Mackell Trust. Ms. Brotherton and her descendants are the sole beneficiaries of the Brotherton Trust. The Swords Trust, the Mackell Trust, and the Brotherton Trust were established by separate instruments of indenture dated February 22, 1957.

When Mr. Reynolds became ill in the late 1990s, Ms. Swords, Ms. Mackell, and Ms. Brotherton became primarily responsible for managing petitioner trusts. They served as cotrustees for petitioner trusts at all relevant times. Robert H. Griffin, a certified public accountant (C.P.A.) and a partner at the Virginia accounting firm of Mitchell Wiggins

& Co., LLP (Mitchell Wiggins), has provided accounting and tax services to petitioner trusts for decades.

## II. *Davreyn*

In 1961 Davreyn was established and began business as a Virginia corporation. At all relevant times Davreyn was a personal holding company (PHC). Each petitioner trust received a substantial number of Davreyn shares at the time of Davreyn's formation.

Before June 2000 Davreyn held a substantial number of shares in Reynolds Metal. In June 2000 Reynolds Metal merged with Alcoa, Inc. (Alcoa), another American aluminum company, and Davreyn's existing Reynolds Metal shares were converted into Alcoa shares.

As of February 1, 2001, Davreyn had assets as follows: (1) 409,830 shares of Alcoa stock and (2) an investment in the Goldman Sachs 1999 Exchange Place Fund (Goldman Sachs fund). The value of the Alcoa stock held by Davreyn exceeded $14 million as of February 2001.

As of February 14, 2001, the Swords Trust, the Mackell Trust, and the Brotherton Trust owned all of Davreyn's common stock. Each trust owned 1,656 of the 4,968 issued and outstanding shares of Davreyn's common stock. The Reynolds Trust owned all of the 35,428 issued and outstanding shares of Davreyn's preferred stock.

Also as of February 14, 2001, Davreyn had officers and directors as follows: (1) Ms. Mackell, who served as president, treasurer, and director, (2) Ms. Swords, who served as vice president and director, (3) Ms. Brotherton, who served as vice president and director, and (4) Mr. Griffin, who served as secretary and director. Mr. Griffin also served as an accountant and adviser to Davreyn, and he prepared its Federal income tax returns for its taxable years before the year in issue. Before the transactions at issue, neither Ms. Swords, Ms. Mackell, nor Ms. Brotherton made any change to Davreyn's operation, except for diversifying Davreyn's holdings by investing in the Goldman Sachs fund.

III. *Petitioner Trusts' Sales of Davreyn Stock*

A. *Initial Meetings and Negotiations*

In the late 1990s BDO Seidman, an accounting firm, advised its local offices about an opportunity for PHC shareholders to sell their appreciated PHC stock to a financial buyer in a tax efficient manner. Jon Glazman, a C.P.A. with BDO Seidman, contacted several attorneys, including Tom Word, an attorney at McGuireWoods LLP (McGuireWoods), to inform them of this opportunity. Mr. Word relayed this opportunity to other McGuireWoods attorneys, including Thomas Rohman, a tax partner. Mr. Rohman later contacted Mr. Glazman about a potential sale of PHC stock by clients of Mr. Rohman. Mr. Glazman put Mr. Rohman in touch with Maurice Gottlieb, another C.P.A. at BDO Seidman who specialized in PHC stock sale transactions. Eventually, Mr. Rohman and Mr. Glazman began working together to sell PHC stock to financial buyers. As of the beginning of February 2000 Mr. Gottlieb had structured several transactions similar to the one at issue with the assistance of Mr. Rohman.

Mr. Rohman at some point contacted Mr. Griffin and advised him of the opportunity for shareholders to sell their PHC stock to a financial buyer. Although neither Mr. Griffin nor petitioner trusts were marketing or seeking to market Davreyn, Mr. Griffin recognized that Davreyn was a candidate for this opportunity because Davreyn was a PHC that held highly appreciated stock. On or before February 10, 2000, Mr. Griffin mentioned to Mr. Rohman that Davreyn was such a possible candidate, and Mr. Rohman relayed that information to Mr. Gottlieb.

On February 10, 2000, at Mr. Gottlieb's request, Mr. Rohman sent to Mr. Gottlieb and Mr. Glazman an email providing more detailed information about a potential sale of Davreyn's stock, including information about Davreyn's tax basis in its assets. In the email Mr. Rohman indicated that Davreyn held two assets, the total market value of which was $15,526,639. These assets were: (1) 193,317 shares of Reynolds Metal common stock, with a market value of $14,498,775, and (2) the Goldman Sachs fund shares, with a market value of $1,027,864.

On March 7, 2000, Mr. Rohman and Mr. Griffin again discussed a potential sale of Davreyn's stock.[6] Nine days later, a meeting was held between Ms. Mackell, Ms. Brotherton, Mr. Rohman, Mr. Griffin, and Lizzie Amos, a manager at Mitchell Wiggins. At the meeting Mr. Griffin and Ms. Amos advised Ms. Mackell and Ms. Brotherton that petitioner trusts had five options with respect to Davreyn: (1) continue Davreyn, (2) liquidate Davreyn, (3) sell Davreyn's stock for 90% of the fair market value (FMV) of its assets, (4) sell Davreyn's stock for the sum of 90% of the FMV of the Reynolds Metal stock plus 25% of the FMV of the Goldman Sachs fund shares, or (5) sell Davreyn's stock for 90% of the FMV of the Reynolds Metal stock and distribute the Goldman Sachs fund shares to a limited liability company (LLC). Mr. Griffin advised Ms. Mackell and Ms. Brotherton regarding the potential sale price, as well as the mechanics and tax consequences of a potential sale of Davreyn's stock.

Because of the merger between Reynolds Metal and Alcoa, any plans regarding the sale of Davreyn's stock were put on hold. After the merger, in September 2000, Mr. Rohman again met with Mr. Griffin, Ms. Mackell, and Ms. Brotherton to discuss the potential sale of Davreyn's stock to a financial buyer. At the meeting Mr. Rohman did not discuss the buyer's plans with respect to either Davreyn or Davreyn's assets.

Following the meeting, on September 8, 2000, Mr. Rohman sent to Ms. Swords, Ms. Mackell, and Ms. Brotherton a memorandum reiterating his presentation and outlining the proposed sale transaction. In the memorandum Mr. Rohman advised that, because of the financial buyer's "peculiar" tax situation, a sale of Davreyn's stock to the financial buyer would be an attractive option for petitioner trusts. Mr. Rohman also stated that the financial buyer would not be interested in purchasing Davreyn if it held any assets other than the Alcoa stock.[7] To account for the existence of the

[6] Mr. Griffin testified that this discussion was the first time he knew that there was a buyer interested in purchasing Davreyn stock. However, Mr. Rohman sent the February 10, 2000, email to Mr. Gottlieb and Mr. Glazman containing detailed information about Davreyn. We therefore reject the referenced testimony and find that Mr. Rohman and Mr. Griffin discussed the sale of Davreyn stock on or before February 10, 2000.

[7] Mr. Rohman calculated Davreyn's assets as follows: (1) Alcoa stock,

other asset, namely, the Goldman Sachs fund shares, Mr. Rohman proposed that the transaction proceed as follows: (1) Davreyn organizes an LLC, (2) Davreyn transfers the Goldman Sachs fund shares to the LLC, (3) Davreyn distributes to petitioner trusts the ownership interests in the LLC in exchange for some of their Davreyn shares, and (4) petitioner trusts sell their Davreyn stock to the financial buyer for cash. Mr. Rohman advised that the purchase price for the Davreyn stock would equal: (1) 90% of the FMV of the Alcoa stock, (2) 100% of all the accrued dividends on the Alcoa stock, and (3) 100% of Davreyn's cash on hand at closing, "less the amount of the estimated corporate income tax incurred by it on the distribution" of the Goldman Sachs fund shares to the LLC.

With respect to the tax consequences, Mr. Rohman advised that petitioner trusts would recognize long-term capital gain in amounts equal to the difference between the total stock sale price and petitioner trusts' tax bases in their Davreyn stock. He further advised that after the transaction, petitioner trusts would own 100% of the LLC and that the LLC would have a tax basis in the Goldman Sachs fund shares equal to their FMV. Mr. Rohman noted that Davreyn would recognize taxable gain equal to the difference between its tax basis and the FMV of the Goldman Sachs fund shares and that "[t]he burden of this corporate income tax liability would effectively fall on the shareholders because the Buyer would reduce the Purchase Price by the amount of this corporate income tax liability." Mr. Rohman concluded that petitioner trusts would recognize long-term capital gain of $13,031,000 and pay tax of $3,356,000 with respect to the proposed stock sale.[8]

Although Ms. Swords, Ms. Mackell, and Ms. Brotherton had not previously considered selling petitioner trusts' shares in Davreyn, arranging a sale of Davreyn's assets, or liquidating Davreyn, they agreed on the advice of Mr. Griffin and Mr. Rohman to sell petitioner trusts' Davreyn stock to the financial buyer. Neither Mr. Griffin, Ms. Swords, Ms.

_____

with an estimated tax basis of $1 million and an estimated value of $13,857,000 and (2) Goldman Sachs fund shares, with an estimated tax basis of $167,000 and an estimated value of $860,000.

[8] Mr. Rohman calculated petitioner trusts' tax liabilities assuming a 20% Federal income tax rate and a 5.75% State income tax rate.

Mackell, nor Ms. Brotherton were aware of the buyer's identity or the buyer's plan with respect to Davreyn or the Alcoa stock Davreyn owned. The buyer was not acting as the agent of petitioner trusts, and Ms. Swords, Ms. Mackell, and Ms. Brotherton were not aware of any plan by the financial buyer to cause Davreyn or any other taxpayer to illegitimately avoid the payment of tax. Mr. Griffin subsequently contacted Mr. Rohman to advise him that petitioner trusts wanted to sell their Davreyn stock to the financial buyer.

On September 13, 2000, Mr. Rohman sent an email to the chief financial officer (CFO) of Integrated Capital Associates (ICA),[9] Howard B. Teig,[10] regarding the proposed stock sale transaction. In the email Mr. Rohman described Davreyn and indicated that Davreyn would transfer the Goldman Sachs fund shares to an LLC before the proposed stock sale. After exchanging a series of emails, on September 15, 2000, Mr. Teig sent to Mr. Rohman an email with an attached draft letter of intent.

### B. *Formation of Davreyn LLC*

On September 15, 2000, Mr. Rohman caused Davreyn LLC to be formed. At formation Davreyn was the sole member of Davreyn LLC. Ms. Mackell and Ms. Brotherton were the initial managers of Davreyn LLC.

### C. *Letter of Intent and Stock Purchase Agreement*

On December 14, 2000, Mr. Rohman emailed Mr. Teig to inform him that the officers and directors of Davreyn had agreed to the proposed stock sale. After exchanging emails Mr. Rohman sent to Mr. Teig an email with an attached draft letter of intent.

---

[9] ICA was an investment banking firm incorporated under Delaware law and based in New York City and San Francisco. ICA had a number of affiliates, including Integrated Acquisition Group, LLC (IAG), and ICA Fund Manager, Inc. (ICA Fund Manager). In addition to his role as CFO of ICA Fund Manager, Mr. Teig served as CFO of IAG and ICA Fund Manager.

[10] Mr. Teig, a C.P.A., performed all of ICA's accounting work, including the preparation of its tax returns. With respect to financial transactions between ICA and a third party, Mr. Teig performed due diligence and worked with the third parties and outside counsel to finalize the transactions.

On January 19, 2001, ICA sent a letter of intent to Davreyn. The letter of intent proposed a purchase price equal to: (1) 90% of the FMV of Davreyn's marketable securities plus (2) 100% of Davreyn's cash and accrued dividend and interest income. The letter provided that petitioner trusts would permit ICA to conduct a full due diligence review of Davreyn before closing. The letter also provided that the buyer would obtain sufficient acquisition financing. Mr. Teig signed the letter of intent as CFO of ICA. Ms. Swords, Ms. Mackell, and Ms. Brotherton executed the letter of intent on behalf of petitioner trusts and returned the executed letter of intent to ICA on January 26, 2001.

On January 22, 2001, Mr. Rohman sent to Mr. Teig an initial draft of the Stock Purchase and Redemption Agreement (stock purchase agreement). With respect to the tax consequences of the transaction, the stock purchase agreement provided that, among other things: (1) the purchase price payable on the closing date would be reduced by an amount equal to the net interim tax liability,[11] (2) the buyer would prepare and file any returns on behalf of Davreyn and pay the related tax for any taxable periods beginning before the closing date and ending after the closing date, (3) the buyer would not cause Davreyn to become a member of a consolidated group for tax purposes after the closing,[12] and (4) the redemption transaction would qualify as a redemption treated as an exchange pursuant to section 302(b)(3). While the stock purchase agreement indicated that the buyer was a statutory trust, the stock purchase agreement did not identify the buyer by name.

---

[11] The stock purchase agreement provided that the net interim tax liability would be equal to the difference between the quarterly tax estimate and the interim tax liability. The quarterly tax estimate would be equal to Davreyn's estimated tax payments for the period beginning January 1, 2001, and ended April 15, 2001. The interim tax liability would be equal to Davreyn's estimated Federal and State tax liability for the period beginning January 1, 2001, and ended on the closing date. In the closing statement Mitchell Wiggens calculated the interim tax liability as $49,800.

[12] The stock purchase agreement also provided that after the closing the buyer would file articles of amendment with the Virginia State Corporation Commission to change Davreyn's name.

On February 6, 2001, Dan L. Rosenbaum [13] emailed Mr. Rohman and Mr. Teig an edited copy of the stock purchase agreement. In the edited stock purchase agreement, Mr. Rosenbaum changed the purchaser's name to Alrey Statutory Trust (Alrey Trust). Alrey Trust [14] was a Connecticut statutory trust established by First Union and Alrey LLC. [15]

D. *Davreyn's Closing Preparations*

Mr. Teig requested that Mr. Rohman instruct Davreyn to: (1) open an account at DB Alex. Brown, LLC, a subsidiary of Deutsche Bank AG (collectively, Deutsche Bank) and (2) transfer its Alcoa stock to Davreyn's newly opened Deutsche Bank account. Accordingly, on February 9, 2001, Ms. Mackell and Ms. Brotherton executed an account agreement to open a brokerage account with Deutsche Bank on behalf of Davreyn. On February 13, 2001, Davreyn transferred its Alcoa stock to its Deutsche Bank account.

E. *IAG's Transfer of Alrey Trust*

On February 13, 2001, in exchange for $525,000, IAG assigned to Alrey Acquisition Corp. (Alrey Acquisition) [16] its 100% membership interest in Alrey LLC, the trustor of Alrey

---

[13] Mr. Rosenbaum was an attorney at the law firm of Sonnenschein, Nath & Rosenthal LLP (Sonnenschein).

[14] On February 7, 2001, Alrey LLC and First Union National Bank (First Union) entered into a trust agreement to establish Alrey Trust. Mr. Teig, acting as CFO of ICA Fund Manager (at the time, the manager of Alrey LLC), signed the trust agreement on behalf of Alrey LLC, the trustor. W. Jeffrey Kramer, acting as vice president of First Union, signed the trust agreement on behalf of First Union, the trustee. Alrey Trust was terminated on June 16, 2003.

[15] Alrey LLC, a Delaware limited liability company, was formed on February 6, 2001. Mr. Rosenbaum acted as incorporator for Alrey LLC. At the time of formation IAG was the sole member of Alrey LLC. ICA Fund Manager was the initial manager of Alrey LLC. At all relevant times Alrey LLC was treated as a disregarded entity for Federal income tax purposes pursuant to sec. 301.7701–2(c)(2)(i), Proced. & Admin. Regs.

[16] Alrey Acquisition, a Delaware corporation, was formed on February 6, 2001. Mr. Rosenbaum acted as incorporator for Alrey Acquisition. On February 6, 2001, Mr. Rosenbaum, acting on behalf of Alrey Acquisition, adopted a resolution electing Larry J. Austin as the sole director of Alrey Acquisition. Sunny Capital Assets 1999 Trust (Sunny Capital) was the sole shareholder of Alrey Acquisition. Mr. Austin was the trustee of Sunny Capital.

Trust. Following the transfer Mr. Austin was appointed as the manager of Alrey LLC. Accordingly, as of February 13, 2001, Alrey LLC was owned outright by Alrey Acquisition, which had only one shareholder, Sunny Capital. Furthermore, as of February 13, 2001, Mr. Austin was the manager of Alrey LLC and the sole director, president, secretary, and treasurer of Alrey Acquisition.

### F. *Alrey Trust's Financing*

Integrated Holdings Ltd. (Integrated Holdings), a company in the Cayman Islands, [17] provided financing, via a loan and a promissory note, for Alrey Trust's acquisition of Davreyn's stock. On February 14, 2001, $16 million was deposited into Alrey Trust's account at First Union, presumably by Integrated Holdings.

### G. *The Redemption Transaction*

On February 15, 2001, Davreyn transferred the Goldman Sachs fund shares to Davreyn LLC in exchange for a 100% membership interest in Davreyn LLC. Davreyn then redeemed 1 share of its issued and outstanding common stock from each of the Swords Trust, the Mackell Trust, and the Brotherton Trust in exchange for the distribution of one-third of its membership interest in Davreyn LLC to each of those trusts. Following the redemption transaction the Swords Trust, the Mackell Trust, and the Brotherton Trust each owned 1,655 shares of Davreyn common stock and a one-third membership interest in Davreyn LLC.

### H. *The Stock Sale Transaction*

Davreyn, petitioner trusts, and Alrey Trust entered into the stock purchase agreement on February 15, 2001. Ms. Mackell executed the stock purchase agreement on behalf of Davreyn, Ms. Swords, Ms. Mackell, and Ms. Brotherton executed the stock purchase agreement on behalf of peti-

---

[17] ICA and First Union planned to use Integrated Holdings as a financier for the Davreyn stock sale transaction as early as February 7, 2001. Mr. Teig testified that Integrated Holdings was a third party unrelated to ICA. However, he later testified that ICA often established entities that began with the word "integrated" and admitted that it was possible that ICA established Integrated Holdings.

tioner trusts, and Mr. Kramer executed the stock purchase agreement on behalf of Alrey Trust.

Pursuant to the stock purchase agreement, on February 15, 2001, the Swords Trust, the Mackell Trust, and the Brotherton Trust each sold 1,655 shares of Davreyn common stock and the Reynolds Trust sold all of its shares of Davreyn preferred stock to Alrey Trust. In exchange Alrey Trust transferred $13,102,055 in cash to an escrow account held by McGuireWoods. [18] On that same date the cash proceeds were wired from the McGuireWoods escrow account to petitioner trusts' accounts at Merrill Lynch as follows: Reynolds Trust—$2,673,431, Swords Trust—$3,416,891, Mackell Trust—$3,416,891, Brotherton Trust—$3,416,891. A portion of the cash proceeds was used to pay petitioner trusts' representatives; McGuireWoods and Mitchell Wiggins received payments of $139,500 and $38,450, respectively.

Mr. Griffin and Ms. Swords, Ms. Mackell, and Ms. Brotherton then resigned from their positions as the officers and directors of Davreyn, effective February 15, 2001. By letter dated February 15, 2001, Ms. Mackell released her authority over Davreyn's Deutsche Bank account.

## IV. *Alrey Trust's Pre- and Post-Closing Transactions*

### A. *Background*

On February 14, 2001, in anticipation of the closing of the sale with respect to Alrey Trust's purchase of Davreyn's stock, Alrey Trust entered into a stock purchase agreement with Deutsche Bank for the sale of Davreyn's Alcoa stock. On the same day, Mr. Kramer accepted the Deutsche Bank offer on behalf of Alrey Trust. The stock purchase agreement between Deutsche Bank and Alrey Trust provided that the sale price would be determined on the basis of Alcoa's closing price on February 14, 2001. Alcoa stock closed at $35.49 per share on February 14, 2001.

---

[18] According to the closing statement the $13,102,055 equaled (1) 90% of the $14,544,867 FMV of Davreyn's Alcoa stock as determined on the basis of Alcoa's closing price on February 14, 2001, plus (2) $61,475 of accrued dividends, less (3) a $49,800 interim tax liability as computed by Mitchell Wiggins.

B. *Davreyn's Liquidation and Other Post-Closing Transactions*

By documents dated February 15, 2001, Mr. Kramer, acting on behalf of Alrey Trust, and Mr. Austin, acting as director of Davreyn, resolved that Davreyn be completely liquidated in accordance with section 331. In an attached plan of liquidation Mr. Austin provided that Davreyn would distribute all of its assets to Alrey Trust in redemption and cancellation of all of the outstanding Davreyn stock. Further, on February 15, 2001, Mr. Austin authorized dissolution of Davreyn and caused to be filed with the Virginia State Corporation Commission articles terminating Davreyn's corporate existence.

Davreyn was liquidated on February 15, 2001, and its assets were distributed to Alrey Trust. Mr. Austin directed Deutsche Bank to transfer the Alcoa stock in Davreyn's Deutsche Bank account to Alrey Trust's account at Deutsche Bank, and Deutsche Bank did so. In addition, Sunny Capital assigned to Alrey Acquisition its shares of common stock of BMY Acquisition Corp. (BMY).[19] Davreyn was terminated and dissolved effective February 27, 2001.

Pursuant to their earlier agreement, Alrey Trust ultimately transferred the Alcoa stock to Deutsche Bank in exchange for $14,446,020 in net proceeds.[20] On February 20, 2001, Deutsche Bank deposited $14,446,010 of the net sales proceeds into Alrey Trust's account.[21] Also on that day, Alrey Trust, at the direction of Mr. Austin, transferred $16,139,452 from its account at First Union to an account at ABN Amro Bank N.V., held under the name MeesPierson (Bahamas) Ltd. Alrey Trust designated this amount as a "loan repayment". After the transfer Alrey Trust's First Union bank account had a balance of $679,504.

Between April 2001 and June 2003 a number of payments were made from Alrey Trust's First Union bank account to

---

[19] Mr. Austin signed the assignment of shares document in his capacity as trustee of Sunny Capital and as chairman of Alrey Acquisition.

[20] The gross proceeds from the sale were $14,544,867. Deutsche Bank calculated the net proceeds by eliminating from the gross proceeds the following amounts: (1) commissions of $98,359, (2) a Securities and Exchange Commission fee of $485, and (3) a handling fee of $3.

[21] The $14,446,010 figure is equal to the net proceeds from Alrey Trust's sale of the Alcoa stock, minus a wire transfer fee of $10.

various entities and individuals, including BDO Seidman, WC Investments, Inc., [22] Emil Pesiri, [23] Bingham Dana LLP, Sonnenschein, Cooper, Brown & Behrle, First Union, Vandalia, LLC, ICA, and Starwalker Group, LLC (Starwalker). [24] On June 19, 2003, Alrey Trust's First Union bank account was closed.

## V. *Tax Reporting*

### A. *Petitioner Trusts*

Each petitioner trust timely filed a Form 1041, U.S. Income Tax Return for Estates and Trusts, for 2001. Mr. Griffin prepared petitioner trusts' Forms 1041. On a Schedule D, Capital Gains and Losses, attached to its Form 1041 the Reynolds Trust reported a $2,664,196 gain from the stock sale. On Schedules D attached to their Forms 1041, the Swords Trust, the Mackell Trust, and the Brotherton Trust each reported a $3,628,247 gain from the sale of the Davreyn common stock and from the redemption of Davreyn stock relating to the Goldman Sacks fund shares. For 2001 petitioner trusts paid Federal income tax as follows: Reynolds Trust—$532,722, Swords Trust—$726,356, Mackell Trust—$726,555, and Brotherton Trust—$726,544.

### B. *Davreyn*

On September 30, 2002, Davreyn mailed to respondent a Form 1120, U.S. Corporation Income Tax Return, for the period January 1 to February 15, 2001. [25] Mr. Teig prepared the Form 1120 and Mr. Austin executed it.

On the Form 1120 Davreyn reported total income of $558,440, including dividends of $61,475, interest of $24, and capital gains of $496,941. On an attached Schedule D Davreyn reported a short-term capital gain of $496,941 attributable to the sale of the "investment in Davreyn LLC". Davreyn reported a basis in the Davreyn LLC investment of

---

[22] WC Investments, Inc., was owned by George Theofel. Mr. Theofel was a former employee and/or representative of ICA.

[23] Mr. Pesiri was a former employee and/or representative of ICA.

[24] Starwalker was an entity established and owned by Mr. Austin. Mr. Austin served as president of Starwalker during the relevant period.

[25] Before the transactions at issue Davreyn used a TYE December 31 for financial and tax accounting purposes.

$1,076,530 and a sale price of $1,573,471, and a Federal income tax liability of $37,560, on its Form 1120.

## C. *Alrey Trust*

Alrey Trust filed a Form 1041 for the taxable year beginning February 7, 2001, and ended January 31, 2002. Alrey Trust attached to its Form 1041 a grantor letter identifying Alrey Acquisition as its grantor. The grantor letter reported a long-term capital gain of $13,424,010, arising from the sale of 409,830 shares of Alcoa stock. The grantor letter stated that: (1) Alrey Trust acquired the Alcoa stock on December 14, 1961, (2) Alrey Trust had a basis in the Alcoa stock of $1,022,000, (3) Alrey Trust sold the Alcoa stock on February 15, 2001, for a gross sale price of $14,446,010, and (4) Alrey Trust's income, deductions, and credits would be reported on Alrey Acquisition's Federal income tax return.

## D. *Alrey Acquisition*

Alrey Acquisition filed a Form 1120 for the taxable year beginning February 6, 2001, and ended January 31, 2002. On its Form 1120 Alrey Acquisition reported interest income of $10,506 and a net loss of $615,543, for a total taxable loss of $605,037 and total tax of zero. On an attached Schedule D Alrey Acquisition reported long-term capital gain from its passthrough entities of $13,424,010 and a short-term capital loss of $13,727,689, resulting from its sale of the BMY stock. [26]

---

[26] With respect to the BMY stock, Alrey Acquisition reported a basis of $13,744,939 and a sale price of $17,250. Alrey Acquisition reported that it acquired the BMY stock on February 15, 2001, and that it sold the BMY stock on December 17, 2001.

Respondent has alleged that Alrey Acquisition's sale of the Alcoa stock and the BMY stock were parts of a Son-of-BOSS transaction. A Son-of-BOSS transaction can be summarized as follows:

[A] variation of a slightly older alleged tax shelter known as BOSS, an acronym for "bond and options sales strategy." There are a number of different types of Son-of-BOSS transactions, but what they all have in common is the transfer of assets encumbered by significant liabilities to a partnership, with the goal of increasing basis in that partnership. The liabilities are usually obligations to buy securities, and typically are not completely fixed at the time of transfer. This may let the partnership treat the liabilities as uncertain, which may let the partnership ignore

Continued

## VI. *Audit of Alrey Acquisition and Davreyn*

In June 2005 the Internal Revenue Service (IRS) began an examination of Alrey Acquisition. As a result of the examination respondent issued to Alrey Acquisition a notice of deficiency disallowing its claimed losses from the BMY stock sale. By letters dated August 8, 2006, respondent informed petitioner trusts that respondent had examined their potential transferee liability with respect to Alrey Acquisition and determined that a transferee examination would not proceed.

In June 2006 the IRS began an examination of Davreyn. After examining Davreyn's Form 1120 respondent determined that the purported sale of Davreyn's stock to Alrey Trust should be recharacterized as a sale of assets by Davreyn followed by a distribution of Davreyn's assets to its shareholders in liquidation. On the basis of this determination respondent increased Davreyn's long-term capital gain by $13,444,080 and determined a deficiency in its Federal income tax of $4,602,986.

## VII. *Notice of Deficiency, Assessment, and Collection*

Respondent mailed to Davreyn a notice of deficiency dated September 23, 2008, for its TYE February 15, 2001. In the notice of deficiency respondent determined a deficiency in Davreyn's Federal income tax of $4,602,986, an addition to tax under section 6651(a)(1) of $1,160,137, an accuracy-related penalty under section 6662 of $920,597, and accrued interest of $3,807,128.

Davreyn did not file a petition in this Court contesting respondent's determinations. Accordingly, respondent treated the notice of deficiency as defaulted and, on January 14, 2009, assessed Davreyn's tax deficiency of $4,602,986, as well as additions to tax under section 6651(a)(1) and (2) of $1,160,137 and $1,982, respectively, an accuracy-related penalty under section 6662 of $920,597, and related interest.

---

them in computing basis. If so, the result is that the partners will have a basis in the partnership so great as to provide for large—but not out-of-pocket—losses on their individual tax returns. [*Kligfeld Holdings v. Commissioner*, 128 T.C. 192, 194 (2007).]

VIII. *Notices of Liability*

On February 25, 2010, respondent sent notices of liability to petitioner trusts. In the notices of liability respondent identified Davreyn as the transferor with an unpaid Federal income tax liability of $4,602,986, plus additions to tax, an accuracy-related penalty, fees, and interest, for a total liability of $10,753,478. Respondent determined each petitioner trust's individual transferee liability on the basis of the total amount each petitioner trust received in the stock redemption and stock sale. [27]

In attached statements respondent advised petitioner trusts that the IRS did not recognize their purported stock sale transactions with Alrey Trust. The statements further advised that the amounts petitioner trusts received for the purported stock sales would be attributable to them "in liquidation or distribution of assets of Davreyn Corporation on or around" February 15, 2001. The statements further explained that the purported stock sale transactions were "substantially similar to an Intermediary transaction tax shelter described in Notice 2001–16 and Notice 2008–111."

OPINION

I. *Overview*

These cases involve several transactions which respondent now seeks to reconfigure in a way that makes the assets of petitioner trusts a source of collection for tax liabilities originally imposed on Alrey Trust and Alrey Acquisition. In simple terms, Alrey Trust purchased all of the Davreyn stock from petitioner trusts so that it could acquire Davreyn's then principal asset, Alcoa stock. With the benefit of hindsight, it now appears that Alrey Trust and Alrey Acquisition were established to participate in a preplanned series of interrelated transactions designed to illegitimately avoid tax on

[27] Respondent calculated each petitioner trust's individual transferee liability as follows: (1) for the Reynolds Trust, respondent determined transferee liability of $2,710,241, consisting of $2,673,431 in cash received and $36,810 in fees paid to professional advisers and (2) for each of the Swords Trust, the Mackell Trust, and the Brotherton Trust, respondent determined transferee liability of $3,833,988, consisting of $3,416,891 in cash received, $370,050 attributable to the transfer of the membership interests in Davreyn LLC, and $47,047 in fees paid to professional advisers.

Alrey Trust's sale of Davreyn's Alcoa stock, which it had acquired as a liquidating distribution. Alrey Trust sold the Alcoa stock incident to receiving it and reported that the substantial gain on the sale was offset by an artificial loss resulting from what appears to have been a Son-of-BOSS transaction by Alrey Acquisition, the grantor of Alrey Trust.

After assessing substantial tax liabilities against Alrey Trust, Alrey Acquisition, and Davreyn, respondent now contends that petitioner trusts' sales of their Davreyn stock were part of a plan by petitioner trusts to illegitimately avoid corporate tax on the distribution of the Alcoa stock in liquidation of Davreyn. Respondent contends that his collection of the tax from petitioner trusts is under the authority of section 6901. The Commissioner has likewise relied upon that section to attempt to collect tax from claimed transferees in other similar cases which have recently come before this Court. *See, e.g.*, *Hawk v. Commissioner*, T.C. Memo. 2012–154; *Salus Mundi Found. v. Commissioner*, T.C. Memo. 2012–61, *vacated and remanded sub nom. Diebold Found., Inc. v. Commissioner*, 736 F.3d 172 (2d Cir. 2013); *Slone v. Commissioner*, T.C. Memo. 2012–57; *Sawyer Trust of May 1992 v. Commissioner*, T.C. Memo. 2011–298, *rev'd and remanded*, 712 F.3d 597 (1st Cir. 2013); *Feldman v. Commissioner*, T.C. Memo. 2011–297, appeal docketed, No. 12–3144 (7th Cir. Sept. 18, 2012); *Starnes v. Commissioner*, T.C. Memo. 2011–63, *aff'd*, 680 F.3d 417 (4th Cir. 2012). This Court concluded in all but one of those cases that the Commissioner's reliance on section 6901 to impose transferee liability upon the claimed transferees was wrong. *See Salus Mundi Found. v. Commissioner*, T.C. Memo. 2012–61 (decisions entered against the Commissioner); *Slone v. Commissioner*, T.C. Memo. 2012–57 (decisions entered against the Commissioner); *Sawyer Trust of May 1992 v. Commissioner*, T.C. Memo. 2011–298 (decision entered against the Commissioner); *Feldman v. Commissioner*, T.C. Memo. 2011–297 (decisions entered for the Commissioner); *Starnes v. Commissioner*, T.C. Memo. 2011–63 (decisions entered against the Commissioner).[28] The Court of Appeals

[28] In *Hawk v. Commissioner*, T.C. Memo. 2012–154, the Court denied the taxpayers' motion for summary judgment, concluding that genuine issues of material fact remained in dispute as to whether they were liable as

for the Fourth Circuit affirmed our judgment in *Starnes v. Commissioner*, 680 F.3d 417, but the Courts of Appeals for the First and Second Circuits did not do likewise in the *Salus Mundi Found.* and the *Sawyer Trust of May 1992* cases. *See Diebold Found., Inc. v. Commissioner*, 736 F.3d 172; *Sawyer Trust of May 1992 v. Commissioner*, 712 F.3d 597. This Court subsequently determined upon remand from the Court of Appeals for the First Circuit that the disputed transferee in the *Sawyer Trust of May 1992* case was liable under section 6901 as a transferee of a transferee but concluded that the liability was less than the Commissioner had determined. *See Sawyer Trust of May 1992 v. Commissioner*, T.C. Memo. 2014–59. [29] We decide the issue at hand with this overview in mind.

## II. *Section 6901(a)*

Section 6901(a) provides that the Commissioner may proceed against a transferee of property to assess and collect Federal income tax, penalties, and interest owed by the transferor (sometimes collectively, transferor's unpaid taxes). *See also* sec. 301.6901–1(a), Proced. & Admin. Regs. A transferee under section 6901 includes, among other persons, a shareholder of a dissolved corporation. *See* sec. 301.6901–1(b), Proced. & Admin. Regs. Section 6901 does not impose liability on the transferee but merely gives the Commissioner a procedure to collect the transferor's existing liability. *Commissioner v. Stern*, 357 U.S. 39, 42 (1958).

The Commissioner may collect the transferor's unpaid tax from the transferee if an independent basis exists under applicable State law or State equity principles for holding the transferee liable for the transferor's debts. Sec. 6901(a); *Commissioner v. Stern*, 357 U.S. at 45; *Hagaman v. Commissioner*, 100 T.C. 180, 183 (1993); *Starnes v. Commissioner*, T.C. Memo. 2011–63, slip op. at 15. State law determines the elements of liability, and section 6901 provides the remedy or procedure to be employed by the Commissioner as the means

transferees under sec. 6901.

[29] This Court has yet to decide *Salus Mundi Found. v. Commissioner*, T.C. Memo. 2012–61, *vacated and remanded sub nom. Diebold Found., Inc. v. Commissioner*, 736 F.3d 172 (2d Cir. 2013), following its remand from the Court of Appeals for the Second Circuit.

of enforcing that liability. *Ginsberg v. Commissioner*, 305 F.2d 664, 667 (2d Cir. 1962), *aff'g* 35 T.C. 1148 (1961); *Starnes v. Commissioner*, T.C. Memo. 2011–63, slip op. at 15. The applicable State law is the law of the State where the transfer occurred. *See Commissioner v. Stern*, 357 U.S. at 45; *Starnes v. Commissioner*, 680 F.3d at 426.

In sum, section 6901 allows the Commissioner to collect a taxpayers's unpaid tax from another person if three conditions are met. First, the taxpayer must be liable for the unpaid tax. Second, the other person must be a "transferee" within the meaning of section 6901. Third, an independent basis must exist under applicable State law or State equity principles for holding the other person liable for the taxpayer's unpaid tax. *Accord Diebold Found., Inc. v. Commissioner*, 736 F.3d at 183–184; *Sawyer Trust of May 1992 v. Commissioner*, 712 F.3d at 604–605. Section 6901 does not apply if one or more of these three conditions is not met. *Accord Commissioner v. Stern*, 357 U.S. 39; *Diebold Found., Inc. v. Commissioner*, 736 F.3d at 183–184; *Sawyer Trust of May 1992 v. Commissioner*, 712 F.3d at 604–605; *Starnes v. Commissioner*, 680 F.3d at 430.

III. *Burden of Proof*

Section 6902(a) provides that in this Court the Commissioner bears the burden of proving that a person is liable as a transferee. *See also* Rule 142(a), (d). Section 6902(a) further provides that the Commissioner does not bear the burden of proving that the transferor was liable for the tax which the Commissioner seeks to collect by way of section 6901. *See also* Rule 142(d); *cf.* Rule 142(a)(1) (generally stating the well-settled rule of *Welch v. Helvering*, 290 U.S. 111, 115 (1933), that the Commissioner's determinations are presumed to be correct and taxpayers challenging those determinations bear the burden of proving them wrong).

Petitioners argue that notwithstanding section 6902(a), respondent bears the burden of proving that Davreyn is liable for the tax determined in the notice of deficiency. This is because, petitioners argue, section 7491(a) applies to shift the burden of proof on that issue to respondent. Pursuant to section 7491(a), the burden of proof shifts to the Commissioner as to any factual issue relevant to a taxpayer's

liability for tax where the taxpayer introduces credible evidence with respect to the issue, sec. 7491(a)(1), and the taxpayer satisfies certain other conditions, including substantiation of any item and cooperation with the Government's requests for witnesses and information, sec. 7491(a)(2); *see also Higbee v. Commissioner*, 116 T.C. 438, 440–441 (2001).

We need not and do not decide whether section 7491(a) applies to shift the burden of proof as petitioners desire. This is because, as discussed below, we hold that section 6901 does not apply to these cases because the record fails to establish that an independent basis exists under applicable State law or State equity principles for holding petitioner trusts liable for Davreyn's unpaid tax and that holding would remain the same even if we decided that Davreyn is liable for the tax as determined in the notice of deficiency.

## IV. *Parties' Arguments*

Each party sets forth various arguments in the posttrial briefs. These arguments include competing views on whether Davreyn is liable for the tax determined in the notice of deficiency and whether petitioner trusts are "transferees" within the meaning of section 6901.

As we previously stated, our holding that section 6901 is inapplicable to these cases would remain the same even if we decided that Davreyn is liable for the tax determined in the notice of deficiency. The same would be true if we also decided that petitioner trusts are "transferees" within the meaning of section 6901. Given that those two issues have no effect on our disposition of these cases, we need not and do not decide those issues in this Opinion. We hereinafter assume (but do not decide) that Davreyn is liable for the tax as determined in the notice of deficiency and that petitioner trusts are "transferees" within the meaning of section 6901, and we confine our discussion to the parties' dispute on whether applicable State law and/or State equity principles hold petitioner trusts liable for Davreyn's unpaid Federal income tax. *See also Commissioner v. Stern*, 357 U.S. at 41–42; *Sawyer Trust of May 1992 v. Commissioner*, 712 F.3d at 604–605; *Starnes v. Commissioner*, 680 F.3d at 427, 430.

Respondent urges the Court to adopt the following two-step analysis to determine whether petitioner trusts, as trans-

ferees from Davreyn, are liable for Davreyn's unpaid tax: (1) analyze whether the subject transactions are recast under Federal law, here primarily the Federal substance over form doctrine, and then (2) apply State law to the transactions as recast under Federal law. One or more transactions are recast or otherwise disregarded under the Federal substance over form doctrine where the transactions, taken as a whole, show that the transactions are shams or have no "purpose, substance, or utility apart from their anticipated tax consequences." *Goldstein v. Commissioner*, 364 F.2d 734, 740 (2d Cir. 1966), *aff'g* 44 T.C. 284 (1965); *see also Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945); *Gregory v. Helvering*, 293 U.S. 465, 469–470 (1935); *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 95 (4th Cir. 1985), *aff'g on this issue* 81 T.C. 184 (1983). The effect of this doctrine is that the substance and not the form of the transactions determines their tax consequences. *Commissioner v. Court Holding Co.*, 324 U.S. at 333–334; *Gregory v. Helvering*, 293 U.S. at 469–470; *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d at 95; *Lazarus v. Commissioner*, 58 T.C. 854, 864 (1972), *aff'd*, 513 F.2d 824 (9th Cir. 1975). Alternatively, respondent contends, petitioner trusts, as transferees from Davreyn and without regard to the Federal law characterization of the transactions, are liable for Davreyn's debts under applicable State law or State equity principles. Petitioner trusts argue that they are not liable for Davreyn's tax liability because, they contend, (1) the transactions may be recast only under applicable State law, which does not provide for any such recast, and (2) respondent failed to show that they are liable for Davreyn's debts under applicable State law or State equity principles.

## V. *Respondent's Proposed Two-Step Analysis*

Respondent asks the Court to adopt his referenced two-step analysis of transferee liability. We decline to do so. The U.S. Courts of Appeals for the First, Second, and Fourth Circuits have rejected the Commissioner's requests to apply that analysis, *see Diebold Found., Inc. v. Commissioner*, 736 F.3d at 184–185; *Sawyer Trust of May 1992 v. Commissioner*, 712 F.3d at 604–605; *Starnes v. Commissioner*, 680 F.3d at 428–429, and we do likewise. In the earliest appellate opinion in

that trilogy of cases, the U.S. Court of Appeals for the Fourth Circuit, applying *Commissioner v. Stern*, 357 U.S. 39, held that the question of whether a transfer occurred for purposes of section 6901 was separate from the question of whether the transfer was fraudulent for State law purposes and concluded that "*Stern* forecloses the Commissioner's efforts to recast transactions under federal law before applying state law to a particular set of transactions." *Starnes v. Commissioner*, 680 F.3d at 428–429. The Courts of Appeals for the First and Second Circuits subsequently followed suit espousing similar rationales. *See Diebold Found., Inc. v. Commissioner*, 736 F.3d at 185–186 (rejecting the Commissioner's argument that State law liability is determined on the basis of a transaction as recast under Federal law); *Sawyer Trust of May 1992 v. Commissioner*, 712 F.3d at 604–605;[30] *accord Ewart v. Commissioner*, 814 F.2d 321, 324 (6th

[30] In *Sawyer Trust of May 1992 v. Commissioner*, 712 F.3d 597, 604 (1st Cir. 2013), *rev'g and remanding* T.C. Memo. 2011–298, the Commissioner argued that this Court erred by: (1) failing to apply the Federal substance over form doctrine to determine whether the taxpayer was a transferee before analyzing the taxpayer's liability under State law and (2) failing to find that the taxpayer had constructive knowledge of the buyer's tax avoidance scheme. The U.S. Court of Appeals for the First Circuit rejected both arguments. *Id.* at 604–606. The court found, however, that this Court failed to analyze whether the taxpayer was liable under a provision of the Uniform Fraudulent Transfer Act that provides that a transfer is fraudulent "'if the corporation didn't receive "reasonably equivalent value" in return for the transfer and as a result was left with insufficient assets to have a reasonable chance of surviving'", even if the taxpayer lacked fraudulent intent. *Id.* at 606–607 (quoting *Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 792 (7th Cir. 2009)). That court remanded the case to this Court to address that issue. *Id.* at 606–612. Here, respondent did not argue in his opening brief that all or any part of the subject transactions was fraudulent for lack of the receipt of "reasonably equivalent value". Nor did respondent notify us (or otherwise argue) that the court's opinion in *Sawyer Trust of May 1992 v. Commissioner*, 712 F.3d 597, which was released after these cases were fully briefed, was pertinent or significant supplemental authority for our consideration of these cases. The Commissioner, by contrast, did argue in the *Starnes* case that a transfer was fraudulent for lack of the receipt of reasonably equivalent value. *See, e.g.*, *Starnes v. Commissioner*, 680 F.3d 417, 430 (4th Cir. 2012), *aff'g* T.C. Memo. 2011–63. In addition, respondent did notify us in these cases that the Court of Appeals for the Second Circuit decided *Diebold Found., Inc. v. Commissioner*, 736 F.3d 172 (2d Cir. 2013), *vacating and remanding*

Continued

Cir. 1987) (the court, relying in part on *Commissioner v. Stern*, 357 U.S. 39, noted that: (1) section 6901 is a purely procedural statute, and (2) the question of a taxpayer's substantive liability is decided on the basis of State law), *aff'g* 85 T.C. 544 (1985).

This Court has previously never explicitly adopted or rejected respondent's proposed two-step analysis to decide whether a transaction should be recast under the Federal substance over form (or similar) doctrine when analyzing whether a transferee is liable under section 6901. Our approach, however, has been to require that State law allow such a transaction to be recast under a substance over form (or similar) doctrine before doing so. *See Salus Mundi Found. v. Commissioner*, slip. op at 25 ("The law of the State where the transfer occurred (in these cases, New York) controls the characterization of the transaction."); *Sawyer Trust of May 1992 v. Commissioner*, T.C. Memo. 2011–298, slip op. at 29–30, 34 (stating that "[t]he law of the State where the transfer occurred (in this case, Massachusetts) controls the characterization of the transaction" and "[w]hether the transactions should be 'collapsed' is a difficult issue of State law on which there is fairly limited precedent"); *Starnes v. Commissioner*, T.C. Memo. 2011–63, slip op. at 21–23 (discussing cases addressing whether certain transactions should be collapsed under the Uniform Fraudulent Conveyance Acts of the corresponding States); *see also Diebold Found., Inc. v. Commissioner*, 736 F.3d at 184 (stating that this Court accepted Diebold's position that under the Commissioner's proposed two-step analysis, Federal law may be used to recharacterize a transaction to determine whether someone is a transferee, but State law determines whether to recharacterize the transaction when analyzing the transferee's liability).

_____

*Salus Mundi Found. v. Commissioner*, T.C. Memo. 2012–61, after these cases were briefed. *See* discussion *infra* note 33. Given our additional discussion *infra* pp. 343–344 that the *Sawyer Trust of May 1992* case involved the Uniform Fraudulent Transfer Act and that Virginia has not adopted that act (or its predecessor), and that the thrust of respondent's argument in these cases is that the Federal substance over form doctrine applies with full force in determining transferee liability, we conclude that respondent has consciously decided to forgo (or has otherwise waived) any argument that all or any part of the subject transactions was fraudulent for lack of the receipt of "reasonably equivalent value".

Our Memorandum Opinion in *Feldman v. Commissioner*, T.C. Memo. 2011–297, does not compel a contrary conclusion. *Accord Slone v. Commissioner*, slip op. at 25 n.9 (describing the facts in *Feldman* as "unique"). The Court in *Feldman v. Commissioner*, slip op. at 25–37, applied the Federal substance over form doctrine to recast a series of transactions and then, without further explanation, applied State law to find the taxpayer liable as a transferee with respect to the recast transaction. Moreover, unlike here (as discussed below), there the Court found that "it is absolutely clear that all individuals involved * * * were aware that * * * [the buyer] and its representatives had no intention of ever paying the tax liabilities" and that the taxpayer and the buyer's financing was a sham transaction. *Id.* at 14, 19.

## VI. *Applicability of State Law*

### A. *Overview*

Respondent argues alternatively that petitioner trusts are liable under applicable State law and/or State equity principles. In this vein, the parties agree that Virginia law is the applicable State law for this purpose. Respondent argues more specifically that the applicable Virginia law is: (1) Va. Code Ann. sec. 55–80 (2012), which imposes liability on the grounds of actual fraud, (2) Va. Code Ann. sec. 55–81 (2012), which imposes liability on the grounds of constructive fraud, and (3) Virginia's trust fund doctrine.

We address the referenced statutory provisions and doctrine in turn. Before doing so, however, we pause briefly to address the scope of the transaction to which Virginia law will be applied.

### B. *Scope of Transaction*

Respondent argues primarily that Federal law sets the scope of the transaction to which State law is applied. We disagree for the reasons stated above. Respondent argues alternatively that Virginia has a substance over form doctrine that applies to recast the series of transactions as one transfer between each of petitioner trusts and Davreyn. Respondent relies on *Burruss Timber Co. v. Frith*, 324 S.E.2d 679 (Va. 1985), to support his alternative argument that Vir-

ginia has a substance over form doctrine that applies to these cases.

Where a decision involves the applicability of State law, as it does here, we, as a Federal court, must apply State law in the manner that the highest court of the State has indicated that it would apply the law. *See Commissioner v. Estate of Bosch*, 387 U.S. 456, 465 (1967); *Estate of Young v. Commissioner*, 110 T.C. 297, 300, 302 (1998). If the State's highest court has not spoken on the subject, then we must apply State law as we see it, giving "proper regard" to relevant rulings of other courts of the State. *Commissioner v. Estate of Bosch*, 387 U.S. at 465; *see also Estate of Young v. Commissioner*, 110 T.C. at 300, 302. We should follow an opinion on the subject by an intermediate appellate court of the State, unless we conclude that the State's highest court would decide otherwise. *See Commissioner v. Estate of Bosch*, 387 U.S. at 465; *Estate of Young v. Commissioner*, 110 T.C. at 302.

In the setting at hand, respondent bears the burden of establishing that the Supreme Court of Virginia, that State's highest Court, would apply a substance over form doctrine to recast the series of transactions as a transfer between each of petitioner trusts and Davreyn. *See Kasishke v. United States*, 426 F.2d 429, 435 (10th Cir. 1970); *Bonney v. Commissioner*, 247 F.2d 237, 239 (2d Cir. 1957) (citing *Helvering v. Fitch*, 309 U.S. 149, 156 (1940), and *Helvering v. Leonard*, 310 U.S. 80, 86 (1940)), *aff'g Towers v. Commissioner*, 24 T.C. 199 (1955); *Dalton v. Commissioner*, 34 T.C. 879, 885 (1960); *Farnsworth v. Commissioner*, 29 T.C. 1131, 1139 (1958), *aff'd*, 270 F.2d 660 (3d Cir. 1959). Respondent relies erroneously on *Burruss Timber Co.*, 324 S.E.2d 679, to meet that burden. In *Burruss Timber Co.*, the court considered whether a real estate broker earned a commission when he helped sell all of the stock of a corporate landowner, rather than the specific landowner assets which the broker was hired to sell. The court analyzed four similar cases from other jurisdictions and found that in each case, the broker accomplished a transaction that was "substantially the equivalent" of selling the assets and, consequently, that disallowing the broker commissions in those cases would have allowed "form to triumph over substance." *Id.* at 681–682. The court declined to apply a substance over form doctrine

to the transaction in *Burruss Timber Co.* and concluded that the broker was not entitled to a commission because the stock sale was not "substantially the equivalent" of the assets sale for which he was hired. *Id.*

In *Burruss Timber Co.* and in the cases discussed therein, the courts considered the substance of the transaction only with respect to the effect of the substance on a third party. The courts did not consider whether, with respect to the legal rights and responsibilities of the parties to the transactions (i.e., the buyer and the seller), the transactions should be collapsed, recast, or disregarded. The Supreme Court of Virginia's opinion in *Burruss Timber Co.* offers no guidance on whether that court would apply the substance over form doctrine described therein to determine the effects of a series of transactions on the actual parties to the transactions.

Respondent has identified no other Virginia case that applied a substance over form or similar doctrine. Nor has respondent argued that the transaction should be collapsed under Virginia bankruptcy law.[31] While respondent references a number of Federal tax cases where a court applied Federal law to disregard a transaction, those cases are inapposite in that they apply Federal law rather than Virginia State law. Respondent has left us unpersuaded that the Supreme Court of Virginia would apply a substance over form analysis to the present setting.[32] This is especially so given our finding, as discussed herein, that petitioner trusts (through their trustees) did not as of the time that their

---

[31] In *Sawyer Trust of May 1992 v. Commissioner*, T.C. Memo. 2011–298, slip op. at 34, for example, this Court consulted decisions of bankruptcy courts to decide which transaction or combinations of transactions should be considered as the relevant transfer for purposes of the Massachusetts Uniform Fraudulent Transfer Act. The approach there is supported by the fact that the Uniform Fraudulent Transfer Act is based on, and consciously designed to operate in accordance with the fraudulent transfer provisions in, the Bankruptcy Code. *See* Prefatory Note, Unif. Fraudulent Transfer Act (1984), 7A (Part II), U.L.A. 4–7 (2006). As discussed *infra* p. 344, Virginia has not adopted the Uniform Fraudulent Transfer Act.

[32] Notwithstanding respondent's citation of a single case from the Supreme Court of Virginia, we have independently searched for additional Virginia cases that could support a conclusion that the Supreme Court of Virginia would apply a substance over form (or similar) doctrine in the setting at hand. We have not found any case that would lead us to predict that it would.

stock was sold have (or have reason to have) any inkling that the buyer, or someone related thereto, was acting to illegitimately avoid the payment of Federal tax. Petitioner trusts believed that they were simply entering into a sale of their Davreyn stock with a willing buyer.

We also are unpersuaded that the Supreme Court of Virginia would apply a substance over form analysis to the present setting because, as respondent asserts, petitioner trusts and/or their representatives had actual or constructive knowledge of Alrey Trust's plan to sell the Alcoa stock and to illegitimately avoid any resulting tax liability. Simply put, the record at hand does not lead us to find that assertion as a fact. *Cf. Diebold Found., Inc. v. Commissioner*, 736 F.3d at 187–190 (court concluded that shareholders had knowledge of illegitimate plan). After these cases were briefed, the Court of Appeals for the Second Circuit decided *Diebold Found., Inc. v. Commissioner*, 736 F.3d 172. There, the court collapsed the series of transactions and found that there was a conveyance under the applicable State statute, the New York Uniform Fraudulent Conveyance Act, because, the court concluded, the taxpayers constructively knew of the entire scheme to illegitimately avoid tax. *Id.* at 187–190. Neither party has requested additional briefing in these cases in the light of *Diebold Found., Inc.*,[33] and we conclude that *Diebold Found., Inc.* is factually distinguishable from these cases for three reasons. First, while New York law reflects an adoption of the Uniform Fraudulent Conveyance Act, Virginia has not adopted that act (or its successor the Uniform Fraudulent Transfer Act) for the relevant period. *See Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 324 n.7 (1999); *Zazzali v. Swenson (In re DBSI, Inc.)*, 463 B.R. 709, 718–719 (Bankr. D. Del. 2012); *In re Best Prods. Co.*, 168 B.R. 35, 52 (Bankr. S.D.N.Y. 1994). *See generally* Isaac A. McBeth & Landon C. Davis III, "Bulls, Bears, and

---

[33] Respondent filed a notice of supplemental authority referencing *Diebold Found., Inc. v. Commissioner*, 736 F.3d 172, and petitioners responded to that notice. Respondent acknowledged in his notice that the relevant State laws in *Diebold Found., Inc.* and in these cases are different (New York and Virginia, respectively) and made no attempt to harmonize the relevant New York law with Virginia law. Petitioners agree that the relevant laws are different and conclude further that the laws are irreconcilable.

Pigs: Revisiting the Legal Minefield of Virginia Fraudulent Transfer Law", 46 U. Rich. L. Rev. 273, 274 n.8 (2011–2012); *id.* at 276, 293 (stating that "as a general matter, the provisions of the UFTA provide greater protection to creditors than Virginia's fraudulent transfer statutes" and analyzing "the UFTA provisions in comparison to their Virginia counterparts and the UFTA provisions that have no Virginia counterparts, so as to identify differences between the two bodies of fraudulent transfer law"). Second, we are unaware of (and respondent has not cited) a Virginia case that applies a collapsing doctrine similar to the New York doctrine applied in *Diebold Found., Inc.* Third, even if respondent relied upon such a doctrine, we find, contrary to the setting in *Diebold Found., Inc.*, that neither petitioner trusts nor their representatives knew (either actually or constructively) of a scheme to avoid the tax liability in issue. [34]

As to the third point, respondent invites the Court to conclude that petitioner trusts were knowing participants in planning the series of transactions that respondent maintains included the sale by petitioner trusts of Davreyn stock and that they therefore are liable for the unpaid tax resulting from the plan. We decline that invitation. In fact, the testimony of Ms. Swords, Ms. Mackell, and Ms. Brotherton convinces us to make contrary findings; i.e., that there was no plan by petitioner trusts to illegitimately avoid

---

[34] The third point also persuades us that the Supreme Court of Virginia would not collapse the transactions at issue in accordance with a certain rationale espoused in *LaRosa v. LaRosa*, 482 Fed. Appx. 750, 2012 WL 1499522 (4th Cir. 2012), and *Starnes v. Commissioner*, 680 F.3d 417. In *LaRosa*, 482 Fed. Appx. at 755 n.3, the court noted in its application of West Virginia law that a court may collapse a series of transactions into a single integrated transaction. The court cited *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co.* (*In re Sunbeam Corp.*), 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002), which stands for the proposition that a series of transactions may be collapsed if the transactions were linked and the transferee had actual or constructive knowledge of the entire scheme. *LaRosa*, 482 Fed. Appx. 750. In *Starnes v. Commissioner*, 680 F.3d at 433, the court, in applying North Carolina law, stated that in deciding whether to collapse transactions in transferee liability cases, the question is whether the taxpayer had actual or constructive knowledge that the sold corporation would become delinquent on its taxes. We also note that the relevant law in *LaRosa* and *Starnes* was that of West Virginia and North Carolina, respectively, while the relevant law here is that of Virginia.

tax, that petitioner trusts had neither actual nor constructive knowledge of Alrey Trust's plan to sell the Alcoa stock and to illegitimately avoid any resulting tax liability, that petitioner trusts were not aware of circumstances that should have led them to make further inquiry regarding Alrey Trust's postclosing plans, and that petitioner trusts had neither actual nor constructive knowledge that Alrey Trust would cause Davreyn to become delinquent on its taxes. The testimony of Ms. Swords, Ms. Mackell, and Ms. Brotherton emphasized that they were unaware of the financial buyer's identity and the reasons a financial buyer would want to purchase Davreyn's stock and that they relied on the advice of their accountants and lawyers. Ms. Swords, Ms. Mackell, and Ms. Brotherton each testified that they did not previously try to sell or liquidate Davreyn. Ms. Mackell testified that petitioner trusts did not consider selling Davreyn until Mr. Griffin and Mr. Rohman approached petitioner trusts in 2000 regarding the potential sale of their Davreyn stock. Ms. Swords and Ms. Mackell both testified that petitioner trusts sold their Davreyn stock to Alrey Trust on the basis of their advisers' recommendation. Ms. Swords, Ms. Mackell, and Ms. Brotherton repeatedly emphasized their complete trust in their advisers, particularly Mr. Griffin. Ms. Swords, Ms. Mackell, and Ms. Brotherton each testified that they did not know the identity of Davreyn's buyer and that they were not aware that the buyer planned to sell Davreyn's Alcoa stock and/or dissolve Davreyn. We find all of this testimony to be credible.

In addition, as to the potential tax consequences of liquidating Davreyn rather than selling its stock, Ms. Brotherton testified that it was not advantageous for petitioner trusts to liquidate Davreyn because doing so would subject her, Mr. Reynolds, and Ms. Swords and Ms. Mackell to two levels of taxation. Ms. Mackell testified further that she and her sisters did not consider liquidating Davreyn because they knew petitioner trusts would incur significant tax liabilities. Again, we find this testimony to be credible.

In *Slone v. Commissioner*, slip op. at 23–24, the Court concluded that the taxpayer was aware of the target corporation's tax liabilities with respect to the asset sale and that the acquiring corporation planned to offset gains resulting from the asset sale. The taxpayer was unaware, however,

that the acquiring corporation planned to offset gains through an illegitimate scheme. *Id.* Here, Ms. Swords, Ms. Mackell, and Ms. Brotherton did not know that Alrey Trust planned to sell the Alcoa stock and generate a significant tax liability, and they were unaware that Alrey Trust, through Alrey Acquisition, planned to offset any tax liability with respect to Davreyn and/or to its assets.

Respondent emphasizes the fact that Mr. Rohman referred to the buyer's "peculiar tax situation" in a memorandum to Ms. Swords, Ms. Mackell, and Ms. Brotherton. Respondent asks us to infer from this single phrase that petitioner trusts were aware of Alrey Acquisition's plan to illegitimately avoid the payment of tax on the Alcoa stock sale gain. We are not prepared to draw such an inference. Mr. Rohman testified that he included this phrase as a reference to the fact that the buyer had losses or anticipated generating losses. As this Court noted in *Sawyer Trust of May 1992 v. Commissioner*, T.C. Memo. 2011–298, slip op. at 37, 45, and in *Slone v. Commissioner*, slip op. at 24, legitimate transactions may be available to offset built-in gain, if recognized, and a taxpayer may contemplate the execution of such a transaction. Accordingly, we will not infer from Mr. Rohman's use of the phrase "peculiar tax situation" that petitioner trusts were aware of the details of Alrey Trust's tax situation or that petitioner trusts knew about, and agreed to facilitate, an illegal tax avoidance scheme. Because petitioner trusts did not know of, approve, or have reason to suspect the multistep plan by Alrey Acquisition and related entities to liquidate Davreyn, to sell the Alcoa stock, and to attempt to illegitimately avoid the tax on that sale by engaging in what likely was a Son-of-BOSS transaction involving BMY stock, we decline to reconfigure the sale by petitioner trusts of their Davreyn stock as respondent contends we should. We find to the contrary that petitioner trusts had no plan to enable Davreyn, Alrey Trust, or Alrey Acquisition to illegitimately avoid tax and that they engaged in an arm's-length sale of Davreyn's stock. *Accord Sawyer Trust of May 1992 v. Commissioner*, T.C. Memo. 2011–298, slip op. at 44–45.

Respondent contends that even if we conclude (which we do) that petitioner trusts and their trustees had no plan to enable Davreyn, Alrey Trust, and/or Alrey Acquisition to illegitimately avoid tax, petitioner trusts, through their rep-

resentatives Mr. Griffin and Mr. Rohman, knew that Alrey Trust planned to offset the gain from the Alcoa stock sale and that the offset was the reason Alrey Trust was interested in purchasing Davreyn. The record does not support this contention, and we decline to find it as a fact. Neither Ms. Swords, Ms. Mackell, nor Ms. Brotherton has a background in business or in tax, and we find that given their lack of business experience, it was not unreasonable for them to rely on the advice of their representatives that the stock sale transaction constituted a legitimate transaction. *See, e.g.*, *Starnes v. Commissioner*, 680 F.3d at 436–437. Moreover, we are not persuaded that any of the representatives knew (either actually or constructively) of the plan to illegitimately avoid tax on the Alcoa stock sale. Mr. Griffin credibly testified that he did not know the identity of the buyer or why the buyer wanted to purchase Davreyn stock. He testified that he did not discuss the buyer's identity or tax situation with Mr. Rohman. Mr. Griffin also testified that at the time of the sale, he did not know that the buyer was planning to liquidate Davreyn or that the buyer planned to sell Davreyn's Alcoa stock to Deutsche Bank.

Mr. Rohman's testimony about the state of his knowledge is not quite so satisfying; he openly acknowledged that he did not know or inquire as to why ICA wanted to acquire PHCs like Davreyn. To his credit, however, he also testified that he understood that the buyer had losses or anticipated losses. He apparently came to this understanding on the basis of a conversation that took place before the closing with Mr. Glazman, Mr. Gottlieb, or Mr. Teig. While Mr. Rohman assumed that the buyer would want to offset these losses with gain, he testified that he was not given any information regarding the buyer's losses and that he had no reason to question the legitimacy of the buyer's losses. In addition, while Mr. Rohman had structured previous sales similar to the transactions at issue, the record does not persuade us that he knew that any of the buyers in those transactions would cause the PHC to liquidate its stock and attempt to illegitimately avoid Federal income tax that would be imposed as to the stock. While the lack of due diligence by Mr. Rohman with respect to the buyer's identity and reputation is problematic, he adequately explained to us that he trusted ICA because ICA was represented by a good national

law firm and a respected international accounting firm and First Union, Alrey Trust's trustor, was a reputable financial institution. He also persuaded us that petitioner trusts had no plan to undertake any steps except to sell Davreyn's stock to the buyer.

This Court in other transferee liability cases has considered similar arguments regarding the knowledge of the taxpayer seller's representatives and has rejected them where the evidence was insufficient to prove that the taxpayer seller knew of the buyer's plan to illegitimately avoid tax. In *Slone v. Commissioner*, slip op. at 23–24, for example, the taxpayers' attorney sent a memorandum to another of the taxpayers' attorneys, explaining that the buyer planned to offset the gain from the sale of the purchased corporation's assets by contributing to the nominal buyer assets with a high basis and low value, then selling those assets at a loss before the end of the taxable year. The Court concluded that this memorandum was insufficient to show that the taxpayers knew of the corporate buyer's illegitimate scheme. *Id.* at 24.

It is clear from Mr. Rohman's testimony that he at least suspected that the buyer would sell the Alcoa stock and offset the gain from that sale with other losses. It is likely that Mr. Griffin, an educated tax professional, also considered such a possibility. There is no credible evidence, however, that either petitioner trusts or their representatives knew about any plan on the part of the buyer to illegitimately avoid the payment of tax on the sale of Davreyn's Alcoa stock, and the representatives' knowledge that an unrelated buyer planned to offset any gain from a sale of the Alcoa stock with incurred or anticipated losses is insufficient to show the existence of a preconceived plan by petitioner trusts to illegitimately avoid tax. This Court has acknowledged that there are legitimate tax planning strategies involving built-in gains and losses and that it was not unreasonable, in the absence of contradictory information, for the representatives to believe that the buyer had a legitimate tax planning method. *See id.*; *Sawyer Trust of May 1992 v. Commissioner*, T.C. Memo. 2011–298, slip op. at 37, 45. We find that while Mr. Rohman and Mr. Griffin knew or had reason to believe that the buyer of petitioner trusts' stock had tax attributes that made the purchase of the stock

attractive, Mr. Rohman and Mr. Griffin did not know or have reason to know that any such tax attributes were improper or that the buyer intended to liquidate Davreyn and to illegitimately avoid any resulting tax liability. [35] We also find that neither Mr. Rohman nor Mr. Griffin was aware of any circumstance that would have caused him to inquire further into the circumstances of the transaction, which Mr. Rohman considered to be a simple stock sale. [36]

In sum, we reject respondent's contention that the transactions at issue should be recast by applying a Virginia substance over form doctrine and decline to collapse the transactions into a single integrated transaction. Instead, we find on the basis of the record at hand that the sale by petitioner trusts of the Davreyn stock to Alrey Trust was in form and in substance a sale of stock and that the transaction should not be recast as a sale of assets followed by a distribution in liquidation. We proceed to evaluate each relevant transaction

---

[35] We are not unmindful of Notice 2001–16, 2001–1 C.B. 730, which was released on January 19, 2001, and was formerly published in the Internal Revenue Manual on February 26, 2001. The stock sale transaction at issue occurred on February 15, 2001, after the release date but before the publication date. While Mr. Griffin and Mr. Rohman were aware of this notice, they credibly explained to us that they did not believe that it pertained to the Davreyn transaction. We also note that this Court has declined to find taxpayers liable as transferees with respect to similar transactions where the transaction occurred both before issuance of Notice 2001–16, *supra*, *see Salus Mundi Found. v. Commissioner*, T.C. Memo. 2012–61, and after its issuance, *see Starnes v. Commissioner*, T.C. Memo. 2011–63.

[36] In *Diebold Found., Inc. v. Commissioner*, 736 F.3d at 188, the Court of Appeals for the Second Circuit concluded that this Court erred in finding that the taxpayers' representatives were not required to make further inquiry into the circumstances of the transaction. To that end, the Court noted that the taxpayers were sophisticated and well-represented persons who recognized the significant tax liability arising from the built-in gains and specifically sought out multiple persons to help them minimize that liability. *Id.* The court also noted that the taxpayers' representatives "had a sophisticated understanding of the structure of the entire transaction" and had actively participated in implementing the transaction. *Id.* at 188–189. The case of *Diebold Found., Inc.* is factually distinguishable from these cases as to this point. Or put differently, respondent has simply not persuaded us that a reasonably diligent person in the setting at hand would have inquired further into whether Davreyn was going to pay its Federal tax for FYE February 15, 2001. *Cf. Starnes v. Commissioner*, 680 F.3d at 433–437.

separately to decide whether petitioner trusts are liable as transferees under Virginia law.

C. *Actual Fraud: Va. Code Ann. Sec. 55–80 (2012)*

We begin our evaluation with Va. Code Ann. sec. 55–80, which provides:

> Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real or personal, every suit commenced or decree, judgment or execution suffered or obtained and every bond or other writing given with intent to delay, hinder or defraud creditors, purchasers or other persons of or from what they are or may be lawfully entitled to shall, as to such creditors, purchasers or other persons, their representatives or assigns, be void. This section shall not affect the title of a purchaser for valuable consideration, unless it appear that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor.

The person seeking to set aside a conveyance as a fraudulent conveyance under this section must prove that (1) "the transfer was made with the intent to delay, hinder or defraud creditors" and (2) "the transferee had notice of the transferor's intent to defraud." *Coleman v. Cmty. Trust Bank, N.A. (In re Coleman)*, 299 B.R. 780, 795 (W.D. Va. 2003), *aff'd in part, rev'd in part and remanded on other issues*, 426 F.3d 719 (4th Cir. 2005). A transferee's fraudulent intent must be proved with clear and convincing evidence. *See Armstrong v. United States*, 7 F. Supp. 2d 758, 764 (W.D. Va. 1998).

Because it is difficult to prove fraudulent intent by direct evidence, fraud may be established by circumstantial evidence, which includes various "badges of fraud". *See id.* These badges include: "(1) the close relationship of the parties, (2) the grantor's insolvency, (3) pursuit of the grantor by creditors at the time of the transfer, (4) inadequate consideration, * * * (5) retention of possession of the property by the grantor", *id.*, and (6) "fraudulent incurrence of indebtedness after the conveyance", *In re Porter*, 37 B.R. 56, 63 (Bankr. E.D. Va. 1984).

Respondent contends that Davreyn transferred to petitioner trusts its assets and cash in liquidation and petitioner trusts are substantively liable for Davreyn's unpaid tax because the transfer was fraudulent under Virginia law. Petitioners contend that respondent erroneously collapsed a

series of transactions into a single transfer. Petitioners further contend that because there was no fraudulent transfer from Davreyn to petitioner trusts, petitioner trusts cannot be liable as transferees of Davreyn under Virginia law. We agree with petitioners.

With the exception of Davreyn's ownership interest in Davreyn LLC, which was transferred to petitioner trusts through a redemption transaction which was not fraudulent, Davreyn did not transfer anything to petitioner trusts. The sales of Davreyn stock occurred between petitioner trusts and Alrey Trust. Accordingly, the relevant inquiry must focus on the value of the consideration petitioner trusts exchanged with Alrey Trust.

Alrey Trust paid petitioner trusts a total of $13,102,055 in exchange for their Davreyn stock. Alrey Trust did not use Davreyn's cash or its assets to purchase the stock from petitioner trusts; instead, it borrowed the funds from a third-party lender, Integrated Holdings. Davreyn was solvent at the time of the stock sale transactions between petitioner trusts and Alrey Trust. At that time Davreyn's only outstanding tax liability related to the redemption transaction and Davreyn had sufficient assets to pay its tax liability. We decline to find that any transfer meeting the requirements of Va. Code Ann. sec. 55–80 occurred between petitioner trusts and Davreyn or Alrey Trust.

### D. *Constructive Fraud*

We turn to Va. Code Ann. sec. 55–81, which provides:

> Every gift, conveyance, assignment, transfer or charge which is not upon consideration deemed valuable in law, or which is upon consideration of marriage, by an insolvent transferor, or by a transferor who is thereby rendered insolvent, shall be void as to creditors whose debts shall have been contracted at the time it was made, but shall not, on that account merely, be void as to creditors whose debts shall have been contracted or as to purchasers who shall have purchased after it was made. Even though it is decreed to be void as to a prior creditor, because voluntary or upon consideration of marriage, it shall not, for that cause, be decreed to be void as to subsequent creditors or purchasers.

The person seeking to set aside a transfer under this section must show that: (1) a transfer occurred, (2) the transfer was not supported by valuable consideration, and (3) "'the transfer was done when the transferor was insolvent or the

transfer rendered the transferor insolvent.'" *Smith v. Porter (In re Carr & Porter, LLC)*, 416 B.R. 239, 260 (Bankr. E.D. Va. 2009) (quoting *Wu v. Tseng*, Nos. 2:06cv346, 2:06cv580, at *6 (E.D. Va. Jan. 24, 2007)). "[T]here must be a showing of indebtedness existing at the time of the transaction." *Id.* (citing *C.F. Trust v. Peterson*, No. 1:97–CV–2003, 1999 WL 33456231, at *10 (E.D. Va. Jan. 8, 1999)); *see also In re Porter*, 37 B.R. at 65.

The only asset Davreyn conveyed directly to petitioner trusts was its ownership interest in Davreyn LLC, which held the Goldman Sachs fund shares. However, this conveyance occurred before the stock sale transaction and did not render Davreyn insolvent.

At the time petitioner trusts sold their Davreyn stock to Alrey Trust, Davreyn was solvent, possessing assets in excess of $14 million, and owed a tax liability of $37,500 (the tax liability that arose in connection with the redemption transaction). Alrey Trust paid a total of $13,102,055 to petitioner trusts in exchange for Davreyn's stock. In calculating the amount owed to petitioner trusts, the parties to the stock sale left sufficient cash in Davreyn to pay the $37,500 tax liability from the redemption transaction. We find no constructive fraud on this record. [37]

### E. *Virginia's Trust Fund Doctrine*

We now turn to respondent's contention that petitioner trusts are liable under Virginia's trust fund doctrine. In *Marshall v. Fredericksburg Lumber Co.*, 173 S.E. 553, 557 (Va. 1934), the Supreme Court of Appeals of Virginia stated:

> But where there are existing creditors of a corporation the stockholders will not be permitted, as against those creditors, to withdraw the assets of the corporation without consideration, whether it be done through a purchase of stock by the corporation or otherwise. We repeat that a stockholder is not entitled to a share of the capital assets of a corporation until the debts have been paid. * * *

---

[37] The series of transactions designed to illegitimately avoid tax occurred immediately after petitioner trusts sold their Davreyn stock to Alrey Trust. Those transactions were planned and orchestrated by Alrey Trust and Alrey Acquisition (and not petitioner trusts), and petitioner trusts had neither actual nor constructive knowledge of those transactions or their purpose.

In *Marshall*, 173 S.E. at 557–558, the corporation received no consideration for its assets. The court emphasized that the transaction at issue was negotiated by the corporation's president, who was obligated "to conserve the assets of the corporation and have them forthcoming for the purpose, primarily, of paying corporation debts." *Id.* at 558. In *Ashworth v. Hagan Estates, Inc.*, 181 S.E. 381, 385 (Va. 1935), the Supreme Court of Appeals of Virginia quoted with approval a Supreme Court of Oregon case stating that the concepts of the trust fund doctrine apply "where a corporation transfers all its assets to another corporation with a view of going out of business, and nothing is left with which to pay its debts".

Mr. Griffin and Ms. Swords, Ms. Brotherton, and Ms. Mackell did not take any actions constituting a winding up or dissolution of Davreyn while serving as the officers and directors of Davreyn. *See Starnes v. Commissioner*, T.C. Memo. 2011–63, slip op. at 31–32 (applying North Carolina's trust fund doctrine in a transferee liability case). When petitioner trusts sold their Davreyn stock, neither petitioner trusts nor their representatives knew that Alrey Trust planned to dissolve Davreyn. When Alrey Trust dissolved Davreyn, Mr. Austin was serving as Davreyn's sole director, and no one associated with petitioner trusts had any role in structuring the sale of the Alcoa stock or in deciding to dissolve Davreyn. Petitioner trusts had no interest in Davreyn when Alrey Trust dissolved it because they had already sold all of their Davreyn stock.

Davreyn was not insolvent when petitioner trusts sold their Davreyn stock. Neither petitioner trusts nor Davreyn's directors attempted to avoid any existing debt of Davreyn. We decline to find on this record that petitioner trusts or Davreyn's directors took any actions before or at the time of the Davreyn stock sale that would support the application of Virginia's trust fund doctrine.

VII. *Conclusion*

Respondent has failed to establish that an independent basis exists under applicable State law or State equity principles for holding petitioner trusts liable for Davreyn's unpaid tax. Accordingly, we hold that section 6901 does not apply to these cases. We have considered the parties'

remaining arguments, and to the extent not discussed above, conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

*Decisions will be entered for petitioners.*